623 So.2d 908 (1993)
STATE of Louisiana
v.
Patricia TATE, Betty Brumfield and Prentiss Tate.
No. 93-K-1281.
Court of Appeal of Louisiana, Fourth Circuit.
August 19, 1993.
*909 Martin E. Regan, Jr., Kevin V. Boshea, Regan and Associates, New Orleans, for relators.
Harry F. Connick, Dist. Atty., Ralph Brandt, Asst. Dist. Atty., New Orleans, for respondent.
Before PLOTKIN, JONES and LANDRIEU, JJ.
JONES, Judge.
On the application of defendants, Patricia Tate, Betty Brumfield and Prentiss Tate we grant certiorari to consider the validity of a judgment of the trial court denying the defendants motion to suppress certain evidence. Having reviewed the transcripts of the motion hearings, the various search warrants and the briefs of the parties, we affirm the judgment of the trial court denying the defendants' motion to suppress the evidence seized from 519 Flood Street and reverse the judgment of the trial court denying the defendants' motion to suppress the evidence seized from the Ryder truck, from # 12 W. Blue Ridge Court and from 1012 Eighth Street.

STATEMENT OF THE CASE
On January 12, 1993, defendant Betty Brumfield was charged with possession with the intent to distribute cocaine and Patricia and Prentiss Tate were charged with possession of over 400 grams of cocaine. Prentiss Tate was also charged with being a convicted felon in possession of a firearm. Their motion to suppress the evidence, heard March 12th and April 27th, 1993 was denied on June 15th. The defendants filed this application for writs of certiorari, mandamus and prohibition seeking relief from this ruling.

FACTS:
The following facts were set forth in the affidavits for four search warrants for three residences and for one rental truck. The affidavit for each warrant contains the same information. In March 1992, police officers in the Narcotics Division received information from a confidential, reliable informant (CI-1) who had supplied information to one of the officers for over a year. CI-1 stated that the residents of 1321 France Street were involved in the distribution of multiple kilograms of cocaine. CI-1 stated that he had personally seen the residents moving narcotics in and out of the residence, and he had observed many of them in possession of guns. CI-1 identified the residents of 1321 France as Winston Little, Bernard Little, and Patsy Tate. CI-1 stated that Winston Little often traveled to Houston, using rental cars and rental trucks, and that upon his return CI-1 had seen narcotics being taken in and out of 1321 France. CI-1 also stated that he had been present for several conversations between Winston and Bernard Little in which they spoke of narcotics trafficking, and he had seen them in possession of large amounts of money. CI-1 described the vehicles used by these suspects as a white Mustang, a white and blue Cadillac, and an older model Ford pickup truck. CI-1 also indicated that Joseph Little, James Little, and Jewel Little, whom he described, were associates of Winston Little living below the Industrial Canal.
The officers conducted surveillance of 1321 France Street during March, April, May, and June of 1992. During that time, they observed one and sometimes two men, who matched descriptions given by CI-1, leave 1321 France, get into a white and blue Cadillac or a white Mustang, and drive to 519 Flood Street. After staying a short time, the men would then leave. Each time this was *910 Observed, however, the occupants of the car were able to elude the officers after leaving 519 Flood. The affidavit does not state how many times during this four-month period that the officers observed this behavior.
The Cadillac and the Mustang were registered to Patricia Tate, whose address was given as either 1321 France or 1340 Gordon Street. A check of the driver's license number listed on both registrations revealed a description of Patricia Tate which matched the description given by CI-1 of Patsy Tate.
In late June, the officers conducted a surveillance wherein they followed a man they believed to be Bernard Little driving the Cadillac from France Street towards Flood Street. However, along the way Little began driving erratically and eluded the officers before reaching Flood Street. Believing that the surveillance had been discovered, the officers discontinued the surveillance of France Street for a time. The officers also contacted CI-1, who told them that he was leaving town because of death threats he had received as a result of cocaine seizures and arrests that had been made based upon other information he had given the police. At the time the affidavit was prepared, the whereabouts of CI-1 were unknown.
At some unspecified point, the officers resumed their surveillance of France Street, but they soon learned that the Winstons and Ms. Tate had moved. The officers checked utility records and discovered that the utilities for 1321 France Street had been transferred in the name of Bernard "Littles" to # 12 West Blue Ridge Court in New Orleans.
Twice in August, officers followed a black male, driving the Cadillac, from # 12 West Blue Ridge Court. On one occasion, the man entered the Flood Street residence, remained a short time, and then exited the house carrying a brown paper bag. He was able to elude the officers after leaving Flood Street. On the other occasion, the officers followed him to 5005 St. Claude Avenue, where he remained a short time. As before, he was able to elude the officers after leaving this address. Based upon their suspicions, the officers decided in September to apply for a pen register for the telephones at the W. Blue Ridge address.
In late September, another officer received information from a second reliable, confidential informant (CI-2) that Jewel "Blacky" Little was distributing cocaine from 5005 St. Claude. CI-2 described Ms. Little and indicated that his knowledge of the drug distribution was based upon personal observation. CI-2 later told the officer that Jewel Little was an associate of Bernard and Winston Little and Ms. Tate. CI-2 indicated that some associates of Ms. Little were illegal alien Hispanics who had assumed false identities in order to remain in the country, and he believed that Winston Little was one such alien. CI-2 also stated he had also personally observed cocaine sales by the Littles from 5111 Burgundy Street.
On the evening of September 24th[1], the officers followed a black man in the Mustang from the W. Blue Ridge address to the corner of St. Claude and "Rene" Street, which is near 5005 St. Claude. The occupant of the Mustang met with several people at that corner for a brief time, and then he drove to the 1300 block of Gordon Street, where he entered an unknown residence. A short time later, he left the residence and drove to a storage facility on Bullard Road, where he secured the Mustang. He then walked back to # 12 W. Blue Ridge Court.
At approximately the same time the next evening, the same man entered a Chevrolet Cavalier, registered to a couple in Braithwaite, placed an unknown object in the car, and then drove it to the same areas where he drove the Mustang the previous evening, those being the corner of St. Claude and "Rene" and the 1300 block of Gordon Street. The man returned to the Blue Ridge address approximately three and a half hours after leaving there.
On September 30th, the officers observed a man driving a Cutlass arrive at the Blue Ridge residence. He entered the house, remained a short time, and then left the house with a black woman. The woman drove away in a Corsica, while the man left in his *911 Cutlass. When it was determined that the Cutlass was taking the same "St. Claude" route that the officers had seen other suspects take on two other occasions, the officers stopped the Cutlass. The driver was identified as James Little, living at # 12 W. Blue Ridge Court. The Cutlass was registered to Patsy Tate, living at 1340 Gordon Street. James Little identified Ms. Tate as his mother. Correspondence lying in plain view on the front seat bore the address 519 Flood Street.
On October 20th, the officers followed two black males in the Corsica from the Blue Ridge residence to the corner of Old Gentilly Road and Louisa Street. There, the Corsica pulled up next to a blue Corolla occupied by a man and a woman. The officers observed what they believed was an exchange of objects between the two cars, and then the cars left the scene. The officers following the Corolla stopped it near the Lakefront, but no contraband was found.
On October 23rd, the officers discovered that the numbers for the two telephones at # 12 W. Blue Ridge Court had been changed on October 21st, the day after the Corolla was stopped. Believing that the surveillance operation was in danger, the officers decided to stop all surveillance until the pen registers for the Blue Ridge telephone lines were established. However, during the course of the investigation, one officer talked with a resident of the Blue Ridge area who told him that he had observed an unusual amount of traffic in and out of # 12 W. Blue Ridge Court since the current residents had moved there in July. The neighbor, who wished to remain anonymous, also told the officer that in the middle of the night on November 11th, he observed a Ryder rental truck arrive at # 12 W. Blue Ridge. A large box was removed from the back of the truck and carried inside # 12 W. Blue Ridge, and then the truck left the scene.
Also during November, the officers ran the names of the various suspects through the police computer. There was no record of a criminal history or a driver's license for Winston Little, causing the officers to theorize that "Winston Little" was an assumed name for an illegal alien. The computer supplied a description of Bernard Littles, which matched that given by CI-1, and revealed that he had two prior drug arrests. His driver's license description was different than that in the computer, and his address listed on his license was 1340 Gordon Street.
The officers found no prior criminal history for Patsy Tate, but a driver's license check revealed the issuance of a license to Patricia Tate, whose description matched that given by CI-1 for Patsy Tate. The address on her license was 1340 Gordon.
According to the computer, James Littles lived at 1321 France Street and had two felony and two misdemeanor arrests, none of which pertained to narcotics. Although the date of birth in the computer matched that on his license, the description in the computer differed from that given on the license. The description on the license matched that given by CI-1. James Littles' address on his license was 1340 Gordon.
The officers found only one municipal arrest for Joseph Littles, who lived at 1340 Gordon. The description given on his driver's license matched that given by CI-1, but the license listed his address as 8023 Trapier Street. There was no computer record or driver's license record for Jewel Littles.
By December 11th, when the pen registers for the Blue Ridge telephone lines had been in place for approximately a month, 1600 out-going and 900 in-coming calls had gone over those two lines. At an average of twenty-seven out-going and eight in-coming calls per day per line, the officers suspected that the calls were being used for narcotics trafficking. The registers also revealed that calls charged to that address from another telephone were placed to a Mobilcomm pager with the capability to page in Houston, thus strengthening the officers' belief that the drug operation was connected with someone in Houston. Over eighty calls were placed to Leo's Restaurant at 1401 S. Rampart Street, an address known for drug trafficking, where some of the officers had made arrests in the past. In addition, over sixty calls were made to 5005 St. Claude Avenue. Investigation revealed this residence was owned by Joseph *912 Littles and that the utilities were listed in the name of Jewel Little.
During that same period, six calls were made to two numbers in Columbia, South America. In addition, over fifty calls were made to 1012 Eighth Street. The telephone at that address was listed in the name of Prentiss Tate, as were the other utilities at that address. A computer check of Prentiss Tate revealed that he had three felony arrests dealing with drugs with one conviction, as well as other arrests and convictions.
Surveillance was continued through December. On December 7th, the officers observed two Ryder rental trucks parked outside 1012 Eighth Street. While the officers watched, a black man and a Hispanic man left the residence, got into one of the trcks, and returned it to a Ryder rental facility. This led the officers to believe that Prentiss Tate may have been the courier for the operation, bringing the cocaine in from Houston.
During the weekend of December 25-27th, several calls were made from the Blue Ridge residence to Columbia and to 1012 Eighth. Believing that a shipment of cocaine may be forthcoming, the officers established a surveillance of 1012 Eighth on the morning of December 28th. At 2:45 p.m., they observed a man later identified as Prentiss Tate leave the house, enter a Ryder truck parked outside, and drive out of the city. The officers followed him for the next fourteen hours, never losing sight of him. They followed him to Houston, where Tate stopped to make a telephone call. They then followed him to an apartment complex where he parked the truck. He left the track, opened the back of the truck, and went inside an undetermined apartment in the complex. The officers observed what appeared to be furniture in the back of the truck.
After a short time, a black Nissan arrived at the complex. The driver met with Tate and then took him what appeared to be gym bags and a box. Tate and the man from the Nissan loaded these items into the back of the Ryder truck. Tate then got back into the truck and drove directly back to New Orleans, arriving back at 1012 Eighth Street at approximately 5:00 a.m. on December 29th. Tate exited the truck and took two packages from the cab of the truck into the residence.
Although this residence and the Ryder truck was kept under surveillance all day, it was not until a little after 8:00 p.m. when Tate left the house and entered the truck. At the same time, another man identified as Tate's brother Archie Tate left the house, entered a mini-van, and drove from the scene. Archie Tate was stopped, but because he was found to be in no violation of the law, he was released.
Because the officers believed that 519 Flood Street was a storage house for the drug operation, officers set up a surveillance there. They observed a green truck parked in the driveway of 519 Flood. At approximately 8:22 p.m. the Ryder truck, which had also been under constant surveillance, arrived at 519 Flood. The officers observed a woman, later identified as Patsy Tate, exit the green truck as Prentiss Tate left the Ryder truck. The pair then removed two gym bags and a box from the back of the Ryder truck and took them inside the house. Believing that a delivery of a large amount of cocaine had just occurred, the officers entered 519 Flood Street to secure it. Ms. Tate was stopped inside the house, while Prentiss Tate was stopped after he had reentered the Ryder truck. Inside an open closet inside the house, the officers observed what they believed to be in excess of thirty grams of cocaine. The officers then entered and secured 1012 Eighth Street and, because it was learned that Archie Tate was Patricia Tate's uncle, the officers also entered and secured # 12 W. Blue Ridge Court.
Based upon these facts, search warrants were issued for the three residences and for the Ryder truck. Seized from 519 Flood Street were: thirty-three brown packages of powdered cocaine (total weight forty-two kilograms); three plastic bags containing solid cocaine (total weight 1976.3 grams); a triple beam scale; a multicolored book bag; a blue and brown gym bag; a brown box; two guns and ammunition; a greeting card addressed to Winston Mejia at 519 Flood; and a document addressed to Patricia Tate at the same address. The only item seized from the Ryder *913 truck parked outside this address was a rental agreement in the name of Prentiss Tate. At #12 W. Blue Ridge Court, the officers seized $405.00, an alien registration card, three photographs, and a greeting card. From 1012 Eighth Street, the officers seized $1000.00 and one bag containing several pieces of crack cocaine (total weight 18.24 grams).
The testimony of the officers at the two suppression hearings for the most part corroborated the information given in the warrant affidavit. In addition, the officer testifying at the first hearing noted that on the morning of December 28th, someone from 1012 Eighth Street went to the Ryder rental store to pick up the truck Prentiss Tate used when he drove to Houston later that day. The same officer testified that the officers decided to apply for the search warrants because they believed that a large delivery had just been made, and they decided to secure 519 Flood Street because they feared that the stop of Prentiss Tate's brother on that same evening would alert the suspects, who might then try to destroy the contraband given the cautious nature of the operation.
The officer testified that when they entered 519 Flood Street, they saw in plain view a gym bag sitting outside a closet. The bag was open, and inside the open bag the officers could see brown paper bricks that the officers believed contained cocaine. Sitting on the floor next to this gym bag was the brown box that the officers had seen the Tates unload from the Ryder truck. A smaller, multicolored bag was lying open next to the gym bag, and inside the bag the officers saw two more kilograms of cocaine and two large plastic bags containing a chunky white powdered substance.[2] The officer testified that another officer then flipped up a bed in the same room and found a gun underneath it. After Ms. Tate was arrested and advised of her rights, in response to an officer's question, she told him that Winston Mejia was her boyfriend. Based upon these findings and the stop of Archie Tate, the officers decided to secure 1012 Eighth, Prentiss Tate's house, and # 12 W. Blue Ridge Court, Patricia Tate's house.
One of the officers who secured 1012 Eighth Street testified that when they entered the house, they found Betty Brumfield in a bed with a four-month-old baby. After being advised of her rights and told the reason for the invasion of her house and the pendency of the issuance of the search warrant, she told the officers that the only contraband in the house of which she was aware was a small amount of crack cocaine in a dresser drawer in the same bedroom. The officers opened the drawer and found a small bag of crack cocaine. The currency was found after the search warrant had been obtained.[3]
An officer who secured # 12 W. Blue Ridge Court testified that the evidence seized from that residence pursuant to the execution of the warrant was seized from a bedroom believed to be used by Ms. Tate and Winston Mejia. An officer who followed Prentiss Tate to Houston testified that the box and gym bag which were found inside 519 Flood were the same ones he saw being loaded onto the truck by Tate and Winston Mejia in Houston. He also testified that Tate and the truck were kept under constant surveillance during the trip to and from Houston, as well as while Tate was in Houston.

DISCUSSION AND RECOMMENDATION:
In their application, the relators contend that the trial court erred by denying their motion to suppress the evidence seized from the three houses and the Ryder truck. Most of the evidence seized in connection with this case was seized pursuant to the issuance of four search warrants. In State v. James, 581 So.2d 349 (La.App.4th Cir.1991), this court set forth the standard of review of the issuance of a search warrant:
C.Cr.P. art. 162 provides that a search warrant may be issued "only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible *914 person, reciting facts and establishing the cause for the issuance of the warrant." The Louisiana Supreme Court has held that probable cause exists when:
the facts and circumstances within the affiant's knowledge, and those of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that evidence [or] contraband may be found at the place to be searched.
State v. Duncan, 420 So.2d 1105 (La.1982). See also State v. Roebuck, 530 So.2d 1242 (La.App.4th Cir.1988), writ denied 531 So.2d 764 (La.1988); State v. Scott, 499 So.2d 1248 (La.App.4th Cir.1986). The facts which form the basis for the probable cause to issue a search warrant must be contained "within the four corners" of the affidavit. Duncan; Roebuck. A magistrate must be given enough information to make an independent judgment that probable cause exists for the issuance of the warrant. State v. Manso, 449 So.2d 480, 482 (La.1984), cert. denied, Manso v. Louisiana, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984).
In its review of a magistrate's finding of probable cause, the appellate court must determine whether the "totality of circumstances" set forth in the affidavit is sufficient to allow the magistrate
to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband ... will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclu[ding] that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317 [2332, 76 L.Ed.2d 527] (1983). (citations omitted)
See also Manso; Roebuck.
James, at 353-54.[4]
The affidavits for the warrants contain information from two separate informants which implicate two somewhat linked groups of people in the large-scale distribution of cocaine. The affidavit contains information of surveillance conducted over ten months which reveals interaction between the two groups and the various addresses indicated by the informants. However, three times during these ten months, various people who had met with the suspected principals were stopped, and in each case no contraband was found. It was not until the day before the warrants were obtained that any real substantive corroboration of the informants' tips was found, when the officers followed Prentiss Tate to Houston and saw him and Winston Mejia load the gym bag and the box into the Ryder truck in the middle of the night, which Tate then immediately brought back to New Orleans. The movement of these items to 519 Flood Street later that day could have given the officers probable cause to believe that cocaine would be found at that address.
The affidavit for the search warrant also includes information which was gleaned from the entry into 519 Flood Street to secure it while the officers were awaiting the issuance of the warrant. The officers maintained that their entry into the house was justified under the "exigent circumstances" exception to the warrant requirement. We agree. See State v. Johnson, 617 So.2d 18, 20 (La.App.4th Cir.1993), wherein this court discussed the applicability of this warrant exception:
Generally, searches may be conducted only pursuant to a warrant which has been issued by a judge on the basis of probable cause. U.S. Constitution, Amendment 4; Louisiana Constitution Article 1 § 5; C.Cr.P. Article 162; State v. Brady, 585 So.2d 524 (La.1991). A recognized exception to the warrant requirement for entry into a building is a quick search of the premises to determine the presence of persons in need, the presence of a perpetrator who might still remain on the premises, or *915 to prevent the destruction of evidence. Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409 [83 L.Ed.2d 246] (1984); United States v. Rubin, 474 F.2d 262 (3rd Cir.1974 [1973]) cert. denied, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); State v. Roebuck, 530 So.2d 1242 (La.App.4th Cir. 1988), writs denied, 531 So.2d 764 (1988).
Probable cause alone does not justify the entry into an area otherwise protected by the Fourth Amendment of the United States Constitution and the Louisiana Constitution, Article 1 § 5. There is a justified intrusion of a protected area if there is probable cause to arrest and exigent circumstances. State v. Rudolph, 369 So.2d 1320 (La.1979). Exigent circumstances are exceptional circumstances which, when coupled with probable cause, justify an entry into a "protected" area that without those exceptional circumstances would be unlawful. Examples of exigent circumstances have been found to be escape of the defendant, avoidance of a possible violent confrontation that could cause injury to the officers and the public, and the destruction of evidence.
State v. Hathaway, 411 So.2d 1074, 1079 (La.1982).
Exceptions to the warrant requirement are carefully drawn and there must be a showing by those who seek exception that the exigencies of the situation make the search imperative. State v. Welch, 449 So.2d 468 (La.1984). The burden is on the government to show that the search falls within one of the exceptional situations. Vail [Vale] v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); State v. Tatum, 466 So.2d 29 (La.1985).
In State v. Woods, 591 So.2d 1323 (La. App.4th Cir.1991), ... officers received information that a person was selling cocaine from a particular residence. The officers' surveillance corroborated this information. The officers arrested the suspect outside the house, then went inside the house "to secure it." The trial court suppressed evidence seized from inside the residence, finding that the officers had more than three days to obtain a search warrant and that "there was no evidence which substantiates a reasonable belief that any other person was in the residence." This Court granted writs and reversed the decision of the trial court, reasoning that the defendant's brother (who the officers had seen one week earlier inside the residence) might be in the residence and that crack cocaine found inside the residence could easily have been destroyed.
In Roebuck, police officers received a tip that Roebuck and his girlfriend were using a certain motel room to store large amounts of drugs which were then taken to other locations for sale. The officers conducted surveillance for several days observing activities consistent with drug trafficking. Officers saw Roebuck and his girlfriend leaving the apartment carrying a brown paper bag. The suspects were stopped and arrested and the officers then entered the room "to secure it" while awaiting the issuance of the warrant. No contraband was discovered in plain view and the room was not searched until after the warrant was issued.
On review of the trial court's denial of their motion to suppress the evidence, the defendants argued that the officers' warrantless entry tainted the subsequent search of the room pursuant to the warrant. This Court disagreed, noting that the officers were justified in entering the room because of the possibility that another person may have been in the room, may have seen Roebuck and his girlfriend being arrested, and may have attempted to leave through a back door with the remaining drugs. This Court came to this conclusion even though the officers could give no basis for the belief that another person was inside the motel room.
In United States v. Rubin, 474 F.2d at 268-269, the court listed circumstances which might lead police officers to reasonably conclude that evidence would be destroyed or removed before they could secure a search warrant:
1) The degree of urgency involved and the amount of time necessary to obtain a warrant;

*916 2) A reasonable belief that the contraband is about to be removed;
3) The possibility of danger to police officers guarding the site of the contraband while a search warrant is sought;
4) Information indicating the possessors of the contraband were aware that the police were on their trail; and
5) The ready destruction of the contraband and the knowledge and efforts to dispose of narcotics and escape are characteristic behavior of persons engaged in narcotics traffic.
In Johnson, supra, the officers had received information that drugs were being sold from a certain address. They established a surveillance and observed what appeared to be drug sales by the defendant in front of the address and then from a nearby car where the defendant's companion was stationed. The officers arrested the companion at the car and then secured the house while awaiting the issuance of a warrant for the house. On appeal of the defendant's conviction, this court found that the officers had probable cause to believe that the house contained drugs, and the arrest of the defendant's companion, of which the defendant would be aware, allowed the officers to enter the house to secure it.
Here, there was probable cause to believe that there were drugs in 519 Flood Street, given the observations of the officers, the tips received from the two informants, and the interlinking of the principals involved in both tips. The relators' argument that perhaps the officers should have applied for the search warrants when Tate brought back to New Orleans the items he picked up in Houston has no merit. Tate arrived back in New Orleans at 5:00 on the morning of the same day that the warrants were prepared and obtained, and we find that the officers did not err by waiting to see what Tate was going to do with these items, given that they were left in the truck when Tate returned home. The issue then becomes whether the officers had exigent circumstances to enter 519 Flood Street in order to secure it. The officers secured the house as Prentiss Tate was getting ready to leave. Archie Tate, Prentiss Tate's brother and Patricia Tate's uncle, had just been stopped by the police, a fact that could soon be communicated to both of them. Given the past caution shown by this particular group, the officers were justified in concluding that there was a distinct possibility that the drugs would be destroyed. Thus, the officers were justified in entering 519 Flood Street to secure it pending the issuance of the warrant.
Relators' reliance upon State v. Talbert, 449 So.2d 446 (La.1984) to support their contention that no exigent circumstances existed to allow the officers to enter 519 Flood Street is misplaced. In Talbert, id, officers on patrol saw Talbert and another man standing in a doorway, and Talbert was holding something wrapped in brown paper. As Talbert saw the officers, he started, ran into the house, and threw down the paper object. The officers ran into the house, seized the object, and arrested the defendant. On appeal, the Court reversed Talbert's conviction, finding that the officers had no probable cause to arrest Talbert and thus were unjustified in chasing him inside the house. Talbert is distinguishable from the situation here because in Talbert the officers had no reason to believe there was contraband in the house and the officers showed no exigent circumstances which would allow their entry into the house.
Likewise, none of the federal cases cited by relators mandate a finding that the officers' entry into 519 Flood Street was illegal. In both United States v. Thompson, 700 F.2d 944 (5th Cir.1983) and United States v. Scheffer, 463 F.2d 567 (5th Cir.1972), cert. den. 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972), the Court found that the officers' entries into the houses were or might have been illegal because the officers set up the encounter which led the officers to make a warrantless entry. In Scheffer, the officers set up a controlled delivery of the drugs, and the Court found that there was no reason why the officers could not have gotten a warrant prior to the delivery. In Thompson, supra, the police set up a controlled buy of drugs, and the defendant was arrested outside the house where the purchase was to be made when he recognized one of the undercover agents. The government argued that the *917 officers entered the house because of their fear for the safety of the informant making the purchase, but the record did not establish this fear. The Court remanded the case to the trial court, however, for a determination if the officers feared that the evidence would be destroyed. The Court also noted that the officers' failure to get a warrant at the first opportunity to do so would not automatically render a warrantless exigent entry unlawful.
In United States v. Webster, 750 F.2d 307 (5th Cir.1984), cert. den. 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985), the Court upheld a warrantless entry into a hotel room even though the officers could possibly have gotten a warrant at an earlier opportunity, where the delay in getting the warrant was only a few hours from the first opportunity and where the officers were involved in a continuation of the investigation when circumstances arose necessitating a warrantless entry. And in United States v. Capote-Capote, 946 F.2d 1100 (5th Cir.1991), cert. den. ___ U.S. ___, 112 S.Ct. 2278, 119 L.Ed.2d 204 (1992), the circumstances were such that the officers did not have an opportunity to obtain a warrant prior to their exigent entry into a residence where a last-minute drug sale had been arranged, where the police were unable to get the informant any money for the sale, and where the informant had entered the residence with the sellers carrying an empty case which was supposed to contain the money for the drug purchase. Thus, the holdings of these cases do not mandate a finding here that the officers' entry into 519 Flood was illegal.
Here, once inside 519 Flood Street the officers observed the cocaine wrapped in brown paper lying inside the open gym bag. This evidence was discovered pursuant to the "plain view" exception to the warrant requirement. For evidence to be seized under this exception, "(1) there must be a prior justification for the intrusion into a protected area; (2) in the course of which the evidence is inadvertently discovered; and (3) where it is immediately apparently without close inspection that the items are evidence or contraband." State v. Hernandez, 410 So.2d 1381, 1383 (La.1982). See also State v. Taylor, 531 So.2d 1137 (La.App.4th Cir.1988). In Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the Court held that evidence found in plain view need not have been found "inadvertently" in order to fall within this exception to the warrant requirement, although in most cases evidence seized pursuant to this exception will have been discovered inadvertently. Here, it appears the officers were justified in entering the house, and based upon their experience as narcotics officers, they recognized the brown-paper-wrapped bricks as most likely containing cocaine.
This issue of whether distinctive packaging is sufficient to allow an officer to "immediately recognize" contraband was discussed at length by this court in State v. Greathouse, 583 So.2d 137, 139 (La.App.4th Cir.1991). In Greathouse, the officers had established a surveillance based upon a tip from an informant that drugs were being sold from a particular house. The officers observed several apparent drug transactions and then observed what they believed was a drug transaction between the defendant and someone on the porch of the house. The defendant was followed and eventually stopped. After a frisk of the defendant and his companions, the officers observed a black film canister roll out his pant leg. A piece of plastic was protruding from the top of the canister. The officers retrieved the canister, opened it, and found it contained cocaine. This court upheld the seizure under the plain view exception, finding that the officers' observations of the possible drug transaction, coupled with the piece of plastic protruding from the top of the canister, gave the officers probable cause to believe that the canister did not contain film and instead contained drugs. Greathouse, id. at 140.
Likewise, in State v. Hall, 555 So.2d 495, 497 (La.App. 4th Cir.1989), writ den. 577 So.2d 44 (1991), as the officer was entering a hotel room, someone tried to close the door on him, and he heard someone yell to "get rid of the s" and heard a toilet flushing. When he eventually entered he saw a plastic bag containing tinfoil packets sticking out of a nightstand drawer. Based upon the room's occupants' actions and the officers' knowledge of drug packaging, this court found the *918 tinfoil packets were lawfully seized pursuant to the plain view exception to the warrant requirement.
Here, based upon the officers' knowledge, their surveillance, and the information received from the informants, it appears that the "bricks" were immediately apparent as contraband, and thus their discovery was lawful. As such, the inclusion in the warrant affidavit of the discovery of this evidence was not error. Therefore, the seizure of all of the evidence from 519 Flood Street was lawful, and the trial court did not err by denying the motion to suppress the evidence seized from that address.
However, the situation with the seizure of the evidence from the other two houses and from the Ryder truck is different. The officers kept the truck under constant surveillance from the time someone from 1012 Eighth Street picked it up from the rental office until the warrant for it was executed. The only things the officers saw Prentiss Tate and Winston Mejia load onto the truck in Houston were the gym bag and the box which they later saw Tate and Patricia Tate take into 519 Flood Street. Thus, because the only contraband connected to the truck had been removed prior to the making of the affidavit, we find that the evidence did not establish that probable cause existed to believe the truck still contained any contraband. Thus, the warrant for the truck was improperly issued, and the trial court erred by denying the motion to suppress the evidence with respect to the evidence seized from it, i.e. the rental agreement in Prentiss Tate's name.
Likewise, there is nothing in the warrant to show that it was more probable than not that the drugs would be found at # 12 W. Blue Ridge Court. The officers believed that the shipment of drugs had just been picked up from Houston, and there was no indication in the affidavit that any of the contraband from the truck was taken to W. Blue Ridge Court. Thus, because there was no probable cause to support a finding that drugs would be found there, the warrant for # 12 W. Blue Ridge Court was improperly issued and the trial court erred by denying the motion to suppress the evidence seized from that address.
With respect to 1012 Eighth Street, Prentiss Tate returned there with the Ryder truck at the conclusion of the Houston trip. Although Tate was observed taking packages out of the cab of the truck into the house when he returned from Houston, these packages were not the ones which Winston Mejia and Tate put into the back of the truck in Houston and thus cannot be said more probably than not to contain contraband. As noted above, the items loaded by Mejia and Tate on the truck in Houston, believed to contain the cocaine, were unloaded only at 519 Flood Street. There was no information contained in the affidavit to support a finding that drugs would probably be found at 1012 Eighth Street. Thus, the warrant for that address was improperly issued, and the trial court erred by denying the motion to suppress the evidence seized there pursuant to the warrant, that being the currency.
A bag of crack cocaine was also seized from the house prior to the issuance of the warrant, when the officers "secured" the premises while awaiting the issuance of the warrant. Although there may have been "exigent circumstances", the stopping of Archie Tate and the arrest of Prentiss and Patricia Tate, no showing was made that probable cause existed to believe that there were drugs in the house. Thus, the officers' warrantless entry into the house was illegal. The officers testified that Ms. Brumfield "consented" to the seizure of the crack cocaine because she directed them to its hiding place in the bedroom where she was lying with the baby. However, no showing was made that this "consent" would have been given absent the officers' forced entry into the house, thus the "consent" cannot be said to have been freely and voluntarily given. Rather, this consent was "tainted" by the illegal entry of the officers. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As noted in United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), there are three exceptions to Wong Sun's exclusionary rule: the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. See also State v. Guy, 575 So.2d 429 (La.App. 4th Cir.1991), writ den. 578 So.2d *919 930 (1991). However, none of these exceptions apply in this case. Because the warrant for the search of the house was improperly issued, the officers would not have inevitably discovered the cocaine. There is no indication that there was an independent source which would have allowed the officers to discover the cocaine. And the seizure was directly connected to the officers' illegal entry into the house. Thus, the trial court also erred by denying the motion to suppress the cocaine seized from 1012 Eighth Street.
Accordingly, we affirm the judgment of the trial court denying the motion to suppress the evidence seized from 519 Flood Street and reverse the judgment of the trial court denying the motion to suppress the evidence seized from the Ryder truck, from # 12 W. Blue Ridge Court and from 1012 Eighth Street.
AFFIRMED IN PART AND REVERSED IN PART.
LANDRIEU, J., concurs in part and dissents in part.
LANDRIEU, Judge, concurring in part and dissenting in part.
I would affirm the trial court's judgment denying defendant's motion to suppress the evidence seized from 519 Flood Street, 1012 Eighth Street and the Ryder truck.
I would reverse the judgment of the trial court, denying the defendant's motion to suppress the evidence seized from # 12 W. Blue Ridge Court.
NOTES
[1] Although the affidavits list this date as September 25th, officers testifying at the suppression hearings indicated that the correct date was September 24th.
[2] This testimony was corroborated by the testimony of another officer as well.
[3] This testimony was also corroborated by the testimony of another officer.
[4] Recently, in State v. John Barrilleaux, 620 So.2d 1317 (La., 1993), the Court somewhat relaxed the "four corners" requirement. However, it appears that this exception should be limited to cases where, for some good reason, additional information known by the affiant is not placed in the affidavit but is orally relayed to the magistrate prior to the signing of the warrant.