I .WILLIAM H. BYRNES, III, Chief Judge.
With respect to the State’s writ application, this Court exercises its supervisory jurisdiction to review the trial court’s ruling that partially granted the defendants’ motion to suppress the evidence, identification and statements. We reverse and remand.

Statement of the Case

On January 28, 2002 the State filed a bill of information charging the defendants Michael Cage, Calvin Jones, and Charles Vincent, with one count each of armed robbery of Diane Hintz. In the same bill, Michael Cage was charged with the aggravated battery of Ms. Hintz.[1] The defendants were arraigned and entered not guilty pleas on February 1, 2002. Separate counsel was appointed for each defendant.
*207 After a joint motion hearing on April 11, 2002, the trial court found probable cause to hold Cage on a charge of simple, not armed, robbery and for aggravated battery. The trial court also granted the motion to suppress .the identification by the victim only; all other motions made by Cage were denied. As to Jones and Vincent the trial court found no probable cause and |3granted the motions to suppress the evidence and statements as to these defendants. The case was left open for the motions as to the third count.
The parties appeared on April 18, 2002, and the trial court set the trial for counts one and two for June 27, 2002. A hearing on the motions on the remaining count is also set for June 27, 2002. Meanwhile, the State filed its writ application for review of the partial denial of the motions to suppress.

Statement of the Facts

On November 19, 2001 at approximately 8:10 p.m., the victim, having just parked her car, was walking in the 700 block of Dauphine Street towards her residence. She spoke to an approaching couple as she passed them. At that point, she saw a man charging towards her. The man grabbed her shoulder and struck her repeatedly in the face, shoulders, and chest as they struggled over her purse. The victim could not see if the man had a weapon. Ultimately he was able to obtain her purse and fled. The victim, who lost consciousness at one point, was transported to the hospital where she received over two hundred stitches on each side of her face. The victim also had stitches placed in her shoulder. On December 11, 2002, she underwent surgery on her face to remove a razor blade from her cheek; part of the blade was still imbedded in her cheekbone when she testified at the April motion hearing.
The victim testified that she was unable to recall what description if any she gave to the investigating police officers. She could, recall that the, robber had a mustache and large lips. In court, the victim identified the defendant Michael Cage as the person who beat her and stole her purse; the identification was based on the similarity in facial structure. The victim I sT°ted that Cage’s hair was not the same as ^me offense- The victim further testified that she had viewed a photo line-up shortly after the crime. She identified one picture as being that of the person who robbed her, but was told by the detective that she had picked the “wrong person.” The victim’s mother, who was present during the photo line-up, said that the right picture had “to be the one who looks the meanest” and pointed at the photograph of the defendant Michael Cage, the same person whom the victim identified in court. The victim also testified that she viewed two inore photographic 'line-ups but made no identifications from them. She stated that she saw only one person involved in the robbery and did not see a vehicle.
■ Shirley Walker testified at the motion hearing that she and a friend, Joseph Washington, were walking on Dauphine Street on November 19, 2001, when she saw a petite woman walking toward them; they spoke in passing. At that time, a vehicle pulled up next to Ms. Walker,' and a man she knew as “Goldy,” whom she identified in court as the defendant Michael Cage, rolled down the window! Gol-dy told Ms. Walker that a woman named Joyce was looking for her, and the 'two talked for a few minutes. Suddenly, Goldy exited the car, saying “I’m going to get the bitch” or “Let’s get the bitch.” Ms. Walker thoúght Goldy was talking about her and stepped back. Goldy approached the woman who had passed them, demanded her bag, and beat her. After Goldy ob *208 tained the victim’s purse, he got back into the rear seat of the car, and it departed the scene.
At the scene of the robbery, Ms. Walker provided the police with a description of Goldy, particularly the fact that he had reddish-gold hair. She Ualso told the police that Goldy could generally be found on St. Philip Street or at the Rainbow Hotel. Ms. Walker knew him because she had supplied drugs to Mm and had let him stay with her. Ms. Walker admitted at the motion hearing that she did not see a weapon in Goldy’s hand.
Ms. Walker testified that there were two people in the car in addition to Goldy, but she did not see their faces clearly. Ms. Walker believed the driver was a man named Charles, who had distinctive “Dr. Spock” ears and a lump “in his bald head.” She stated that she viewed a photo line-up from which she identified a picture of Charles (the defendant Charles Vincent) and that she noted she thought he was in the car.
Detective Christopher Goodly testified that he was assigned to the Eighth District and was called to the scene of the robbery in the 700 block of Dauphine Street. His supervisor designated him to be the lead investigator. He did not speak to the victim as she had already been transported to the hospital. He did speak to the two witnesses, Shirley Walker and Joseph Washington. They related the same sequence of events as that testified to by Ms. Walker. According to Detective Goodly, both witnesses identified the robber as Goldy and described him as a drag queen who hung out at the Bourbon Pub, the Oz Club, and the Rainbow Hotel. Also, Mr. Washington provided a description of. the vehicle in which Goldy fled, including a license plate number of IGT-225.
Detective Goodly dispatched officers to check out these locations. Initially, the officers checked the clubs, but there was no sign of the suspect, so they went to the Rainbow Hotel. There, they saw a car which matched the general description and which had a plate number of IGT-228, one —[¡¿lumber off from that given by the witness. The officers spoke with the manager at the Rainbow and were informed that the three occupants of the vehicle had checked into two separate rooms, 203 and 228.
Detective Goodly and the other officers split into two groups and approached rooms 203 and 228 simultaneously. Detective Goodly’s group went to room 203, knocked on the door, identified themselves as police, and then heard a struggle inside. Suddenly the door opened and Charles Vincent threw Cage/Goldy, who was totally naked, out of the room, saying: “He did it.” Vincent then tried to barricade himself in the room; he also ran to the bathroom, flushed something, then came back out with his arms up. Both Vincent and Cage were placed in custody.
At the motion hearing, Detective Goodly related that the team of officers who went to room 228 found the victim’s credit card sitting out in plain view. The defendant Ronald Jones was in that room with a female who was not arrested. When the officers asked Jones where he got the credit card, he stated that “Goldy and his old man robbed that lady in the French Quarters.” Jones was also arrested.
The officers also confiscated a parking lot surveillance tape from the Rainbow Hotel. That tape showed the defendants pulling in at around 8:24 p.m. Vincent was driving; Jones was in the front passenger seat, and Cage was in the back. Cage got out with a big bag; all three men rummaged through it removing items.
After the three defendants were arrested, they were taken to the Eighth District *209 Station. Detective Goodly provided Vincent and Jones with their Miranda rights by a written Rights of Arrestee form. Each waived his rights |fiand provided the detective with a typed statement. They admitted that they had been in the car, but denied knowing that Cage intended to rob anyone; they thought he was going to “turn a trick.” They admitted driving Cage from the scene.
In additional testimony at the motion hearing, Detective Goodly stated that a second credit card belonging to the victim was discovered on a bench at the district station; all three defendants had been seated on the bench. -The detective did not dispute that a record of a 1999 arrest of Shirley Walker showed that he had been the arresting officer.
At the motion hearing, Detective Chris Cambiotti and Officer Iain Watts were the only other witnesses who testified regarding the November 19, 2001 incident. Detective Cambiotti testified that he and his partner Detective Baye were the first detectives on the scene. They spoke with the witnesses Walker and Washington, obtaining the information regarding Goldy and the vehicle involved. He and his partner located the vehicle at the Rainbow Hotel and summoned Detective Goodly and other officers. Detective Cambiotti accompanied Detective Goodly to room 203. He corroborated Detective Goodly’s testimony that they knocked and announced themselves and that Cage was pushed out of the room completely nude. Detective Cambiotti stated that Cage matched the description given by the witnesses, specifically, a tall thin man with red hair and gold teeth. The detective further testified that he did not view the surveillance video from the Rainbow Hotel until later.
After the defendants were arrested, Detective Cambiotti and Detective McMullen returned to the Rainbow and found the black bag in the stairwell.
• |70fficer Watts stated that he was a uniformed officer and was part of the team that went to room 228. He recounted that they knocked and announced themselves as police officers. After entering the room, they secured the occupants, Ronald Jones and a female. Officer Watts testified that Detective McMullen seized a credit card which was sitting in plain view on a dresser. Detective McMullen, after advising Jones of his Miranda rights, asked him where he got it. Officer Watts could not recall if they were given permission to enter room 228. He did recall that Jones and the female were not dressed.
■ After the State finished presenting its witnesses, counsel for Charles Vincent drew the trial court’s attention to the surveillance video from, the Rainbow Hotel, specifically that the tape showed Vincent in the hallway in conversation with a police officer for approximately fifteen minutes. The court inquired as to whether there were any stipulations regarding the video, including whether it showed the three defendants going through a black bag, and counsel for Ronald Jones indicated that no stipulation .was possible. Counsel informed the court that the tape would not show Jones exiting the vehicle nor did it show Jones registering for a room at the same time Cage and Vincent did.
Immediately after these comments by the attorneys for Vincent and Jones, the trial court stated that it found probable cause for all defendants and denied all of the motions to suppress. At that point, defense counsel for Jones stated that she wished to call additional witnesses, particularly other officers who entered Jones’ room and interrogated him. The trial court then [gheard additional argument but no testimony and ultimately granted the motions in part as noted above.

*210
Probable Cause to Arrest Vincent and Jones

Initially at issue is whether the trial court erred when it found that there had been no probable cause for the arrests of Charles Vincent and Ronald Jones.
In State v. Simms, 571 So.2d 145, 148-149 (La.1990), the Louisiana Supreme Court made a full and comprehensive statement of the elements and qualities of probable cause, as follows:
Probable cause to arrest exists when the facts and circumstances within the officer’s knowledge are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); State v. Wilson, 467 So.2d 503 (La.1986). The determination of probable cause, although requiring something more than bare suspicion, does not require evidence sufficient to support a conviction. Probable cause, as the very name implies, deals with probabilities. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The determination of probable cause, unlike the determination of guilt at trial, does not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the available evidence supports a reasonable belief that the person to be arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); State v. Rodrigue, 437 So.2d 830 (La.1983). The determination of probable cause involves factual and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. State v. Ogden and Geraghty, 391 So.2d 434 (La.1980)
Additionally, in State v. Collins, 378 So.2d 928, 930 (La.1979), cert. denied sub nom. Collins v. Louisiana, 447 U.S. 928, 100 S.Ct. 3025, 65 L.Ed.2d 1122 (1980), the Louisiana Supreme Court stated:
lflOne of the most important elements in determining whether probable cause existed is' satisfied when the police know a crime has actually been committed. When a crime has been committed and the police know it, they only have to determine whether there is reasonably trustworthy information to justify a man of ordinary caution in believing the person to be arrested has committed the crime. In many cases the police do not know that a crime has been committed. When the arrest or search is made when the police do not know that a crime has been committed, more and better evidence is needed to prove that probable cause exists for the arrest than is the case when the police know a crime has been committed. State v. Johnson, supra. [363 So.2d 684 (La.1978) ].
See also State v. Frosch, pp. 1-2, 01-K-1033 (La.3/22/02), 816 So.2d 269, 269-270, in which the Louisiana Supreme Court stated:
In any event, ..., an arrest for a crime for which probable cause does not exist can be justified by the probable cause to arrest for another offense. State v. Wilkens, 364 So.2d 934, 937 (La.1978); see also, United States v. Bizier, 111 F.3d 214, 218 (1st Cir.1997) (“Probable cause justifying a lawful custodial arrest ... need not be for the charge eventually prosecuted.”); Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3rd Cir.1994) (“Probable cause need only exist as to any offense that could be charged under the circumstances.”)(emphasis added).
In the present case, the investigating officers knew that a purse snatching or possible armed robbery had just occurred. *211 The eyewitnesses stated that they knew the person who physically attacked the victim and were able to provide a detailed description, including the nickname and likely location of-the robber. Moreover, the witnesses gave a description of the getaway vehicle, including a license plate number, and provided the additional information that two other persons were in the getaway car. Within minutes the detectives located a car that matched the description of the getaway vehicle, and the only difference was a one-digit change in the license plate number. The vehicle was located at one of the places where the witnesses suggested that Goldy could be found. An employee at the hotel Instated that three males arrived together, confirming the witness’s statement that a total of three men had been in the getaway ear. At that point, even if it could be argued that the officers did not know whether the two men with Goldy had been involved in the robbery from the beginning, they clearly were accessories after the fact, and as such could be arrested.

Search of Hotel Room

The second issue is whether the trial court correctly suppressed the credit card seized from Jones’ hotel room. The court held that the State did not present evidence of a valid consent for the officers to enter. Implicit in the trial court’s suppression of the evidence was its finding that the officers did not have probable cause to enter the hotel room to arrest Jones.
In State v. Smith, 96-2161 p. 3 (La.App. 4 Cir. 6/3/98), 715 So.2d 547, 549, this Court discussed the plain view exception:
In order for an object to be lawfully seized pursuant to the “plain view” exception to the Fourth Amendment, “(1) there must be a prior justification for the intrusion into a protected area;. (2) '.in the course of which the evidence is inadvertently discovered; and (3) where it is immediately apparent without close inspection that the items are evidence or contraband.” State v. Hernandez, 410 So.2d 1381, 1383 (La.1982); State v. Tate, 623 So.2d 908, 917 (La.App. 4 Cir.), writ denied 629 So.2d 1126 and 1140 (La.1993). In Tate, this court further noted: “In Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the Court held that evidence found in plain view need not have been found “inadvertently” in order to fall within this exception to the warrant requirement, although in' most cases evidence seized pursuant to this exception will have been discovered inadvertently.” Tate at 917.
|nIn the present case Officer Watts testified that he and other officers entered room 228 to secure the occupants, one of whom was Ronald Jones, for whom there was probable cause to arrest, at least as an accessory to the robbery of the victim. The victim’s credit card was sitting out on a dresser in plain view. Thus it was subject to seizure. The trial court erred in suppressing this evidence.

Statements of Vincent and Jones

The next issue is whether the trial court correctly suppressed the confessions of Vincent and Jones. Again, the trial court’s rulings appear to be based solely on the fact that there was no probable cause to arrest either man, and therefore any statements are the “fruit of the poisonous tree,” see Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
The. State has the burden of proving the admissibility of a purported statement at a motion to suppress hearing. La.C.Cr.P. art. 703(D); State v. Hohn, 95-2612, p. 3 (La.App. 4 Cir. 1/19/96), 668 So.2d 454, 456. Before a statement or *212 confession can be admitted into evidence, it must be shown that it was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements or promises. La. R.S. 15:451. State v. Sepulvado, 93-2692, p. 4 (La.4/8/96), 672 So.2d 158, 163, cert. denied sub nom. Sepulvado v. Louisiana, 519 U.S. 1035, 117 S.Ct. 600, 136 L.Ed.2d 527; State v. Hohn, supra. “The testimony of police officers alone can be sufficient to prove the defendant’s statements were freely and voluntarily given.” State v. Gibson, 93-0305, p. 7 (La.App. 4 Cir. 10/13/94), 644 So.2d 1093, 1097. In determining the voluntariness of a 11 ¡.statement, the trial court must review the totality of the circumstances. State v. Sepulvado, supra; State v. Dunn, 94-776, p. 15 (La.App. 5 Cir. 2/15/95), 651 So.2d 1378, 1387. A trial court’s determination as to the admissibility of a statement is within the discretion of the trial court and its decision will not be disturbed unless unsupported by the evidence. State v. Samuels, 94-1408, p. 7 (La.App. 4 Cir. 6/7/95), 657 So.2d 562, 566.
In State v. Watson, 99-1448 p. 19 (La. App. 4 Cir. 8/23/00), 774 So.2d 232, 242, writ denied 2000-2968 (La.9/28/01), 798 So.2d 106, this Court stated:
The protections of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, (1966) are only applicable when a person is the subject of a custodial interrogation. State v. Pomeroy, 97-1258 (La.App. 5 Cir. 5/13/98), 713 So.2d 642. A suspect is “in custody” for Miranda purposes when placed under formal arrest or when a reasonable person in the suspect’s position would have understood the situation to constitute a restraint of freedom of movement of the degree associated with formal arrest. State v. Hammond, 97-1677 (La.App. 4 Cir. 12/30/97), 706 So.2d 530. Under La.C.Cr,P. 201, in order to constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him. An arrest occurs when the circumstances indicate intent to effect an extended restraint on the liberty of the accused, rather than at the precise time an officer tells an accused he is under arrest. State v. Raheem, 464 So.2d 293, 296 (La.1985); State v. Gibson, 97-1203 (La. App. 5 Cir. 3/25/98), 708 So.2d 1276.
In the present case, Officer Watts testified that Ronald Jones was verbally advised of his rights at the hotel room before he was questioned about how he obtained the victim’s credit card. Additionally, Detective Goodly testified that he advised both Jones and Vincent of their rights at the 1 ^police station and that each executed a written waiver of rights form prior to giving their formal statements. The statements were not subject to suppression.
Detective Goodly’s testimony also established that Charles Vincent made another statement when the officers first encountered him at the hotel room, specifically, when Vincent threw Cage out of the room saying that Cage did it. That statement was made before the officers had taken anyone into custody; at that point they had only knocked on the door and announced that they were police officers. The statement was spontaneous and not the result of any custodial interrogation. The trial court erred when it suppressed it.

Identification of Cage

Finally, at issue' is whether the trial court erred when it suppressed the identification made by the victim of the defendant Michael Cage; The State argues that *213 the victim in fact did not make an identification of Cage from the photo line-up and thus it is exculpatory and not subject to suppression.
With respect to the law relative to suggestive identification procedures, in State v. Martello, 98-2066, pp. 6-7 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1198, this Court stated:
This Court set forth the applicable law pertaining to out-of-court identifications in State v. Brown, 98-0510, p. 7 (La.App. 4 Cir. 7/14/99), 744 So.2d 93, as follows:
When reviewing an out-of-court identification procedure for its constitutionality and its consequent admissibility, the court must first make a determination of whether the police used an im-permissibly suggestive procedure in obtaining the out-of-court identification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Hankton, 96-1538 (La. App. 4 Cir. 9/16/98), 719 So.2d 546, writ denied, 98-2624 (La.1/29/99), 736 So.2d 828; State v. Sterling, 96-1390 (La.App. 4 Cir. 11/13/96), 684 So.2d 74. If the court finds the identification suggestive, it must then decide, under the totality of the circumstances, if the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. Manson, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140; Prudholm; Hankton; Sterling.
In Manson, the Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Hankton; Sterling. As noted by this court in Sterling: “The deféndant bears the burden of proving that an out-of-court identification itself is suggestive, and that there was a likelihood of misidentification as a result of the identification procedure, [citations omitted] An identification procedure is unduly suggestive if it focuses attention on the defendant.” 684 So.2d at 75.
In the present case, the State assumes that the “identification” which the court suppressed was the photographic line-up proceedings. This is not clear from the record. Thé victim did identify Cage; she made the identification in open court after identifying someone else in the photo lineup. If the trial court meant to suppress that, it would have erred because the victim did not identify Cage from the photographic lineup.
The trial court may have meant to suppress the victim’s in-court identification of Cage. However, the court merely stated that it was granting Cage’s motion to suppress the identification as to the victim, “Based on the police officer’s suggestibility that the person she picked out was the 115incorrect person” while denying the motion as to the identification made by Shirley Walker. Because the defendant’s pretrial motion to suppress the identification pertained to the out-of-court procedure, and could not apply to an in-court identification that had not yet occurred, it appears that the trial court did not suppress the in-court identification.
In his response to the State’s writ application, the defendant Cage claims that: “Neither Detective Goodly nor the Assistant District Attorney informed defense counsel that Ms. Hintz’s mother had been illegally present at the identification interview or that her mother had suggested to *214 her daughter that the defendant might have committed the assault.”
In State v. Sterling, 96-1390 (La.App. 4 car. 11/13/96), 684 So.2d 74, the police asked a sixteen-year old witness to a murder to view a photo line-up. At the time, the officer did not know that the witness’s mother had also had an opportunity to view the perpetrator. The photo line-up was conducted in the presence of both mother and daughter. After the daughter identified the defendant’s picture, her mother also identified the defendant’s photograph. The mother later testified that she had also recognized another of the photos and thought that maybe the other photograph was of the man who shot the victim. However, after looking again, she selected the defendant’s picture. In reversing the ruling granting the motion to suppress the identification made by the mother, this Court stated:
Ms. Jones explained that she saw the perpetrator but not the shooting. The police did not realize that Ms. Jones was a witness because she said she did not see the shooting, and therefore the officers were in good faith when they presented the line-up to mother and daughter at the same time. Therefore, suppressing the identification will 1^not serve the purpose of deterring improper police conduct. The three month lapse between the crime and the photographic line-up is not so long as to make the identification unreliable. Detective Daniel McMullen testified that both Ms. Martin and Ms. Jones did not indicate that they were not positive or that they could not make an identification.
Considering the totality of circumstances, the photographic identification, even if suggestive, nonetheless produced a reliable identification. Sterling, pp. 7, 684 So.2d at 77.
This Court noted that at trial the defense could introduce evidence of the circumstances surrounding the identification.
In the present case, the mother’s presence was not illegal where she was not a witness and her comments could not have a bearing on the identification because she .'was not present at the commission of the offense. The daughter was aware that her mother could not possibly know who the perpetrator was. The victim testified that she picked the wrong photograph. The defense has the exculpatory evidence of misidentification of the photographic lineup and can introduce evidence surrounding the misidentification at trial.
There was no out-of-court identification of Cage by the victim, and the victim’s in-court identification should not be suppressed.
Accordingly, the trial court’s ruling to partially suppress the evidence is reversed, the motions to suppress are denied, and the case is remanded for further proceedings.

WRIT GRANTED; REVERSED & REMANDED.

. Cage and Jones were also charged with the armed robbery of another victim arising from a separate incident; that charge is not at issue in this writ application. The bill was subsequently amended to reflect that Jones' correct name was Ronald, and that his use of the name Calvin was an alias.