J^PLOTKIN, Judge.
On April 23, 1997, the appellant, Mar-trice Brown, was charged with two counts of distribution of cocaine. At her arraignment on May 5,1997, she'pled not guilty to both counts. Her motion to suppress the identification was heard and denied on July 9, 1997. On September 4, 1997,, at the conclusion of a two-day trial, a twelve-person jury found her guilty as charged on both counts. The court sentenced her on November 20, 1997 on each count to five years at hard labor, suspended, and placed her on five years active probation with the condition that she serve one year in jail. This timely appeal follows.

FACTS:

In the early evening of October 3, 1996, Agent Brent Cannon of the St. Charles Parish Sheriffs Office was working in an *95 undercover capacity in Plaquemines Parish. Equipped with a body microphone and a video camera mounted in his car to tape activity near the driver’s door, he drove to the-Sunrise area of Plaquemines Parish to a short street named Good Rocking Lane. Once there, he met with a black man who identified himself as “Red” and asked Cannon what he was “looking for.” When Cannon replied he was looking for “rocks,” Red |?told him he knew where Cannon could get some, but Red would have to ride with Cannon to that location. Cannon agreed, and Red entered the car and directed him to an area near Good Rocking Lane. However, his efforts to find someone were unsuccessful, and Red then directed Cannon to return to Good Rocking Lane. Once they arrived, Red left the car and spoke with a woman later identified as the defendant Martrice Brown.[1] Red spoke with Ms. Brown, who then approached Cannon’s car with Red. Red got back into the passenger side of the car, while Ms. Brown stood outside the passenger door. Cannon testified that Ms. Brown asked him what he wanted. When he replied he was looking for “rocks,” she produced a small rock-like object and gave it to Red, who then passed it to Cannon. Cannon testified Ms. Brown told him to give the $20.00 for the rock to Red, who then gave it to Ms. Brown. Ms. Brown left, and Red exited the car and left.
Cannon testified he drove away from the area and broadcast to other officers in the area a description of Ms. Brown, which included her having red hair. He also gave a description of Red. Cannon drove to another area to try to find another person to sell him drugs, but after seeing no one else, he returned to Good Rocking Lane approximately four minutes after the first sale by Ms. Brown was completed. Again, Red approached him, and Red asked him if he had returned “to see your old girl.” When Cannon replied affirmatively, Red left and shortly returned with Ms. Brown. Cannon testified Ms. Brown asked him if he needed “more,” and when he said he did, she gave another rock-like substance to Red, who gave it to Cannon. Again, Cannon gave $20.00 to Red, who then gave it to Ms. Brown. Cannon testified that this transaction also occurred on the passenger side of the undercover Lear, out of the camera’s range.
Cannon testified he then left the area and met with Agent Carroll Abadie of the Plaquemines Parish Sheriffs Office, who had been stationed nearby, but out of sight, and who was in charge of the undercover operation. Cannon gave the two rocks to Abadie. Abadie conducted a field test on the rocks, both of which tested positive for cocaine. Cannon testified that approximately a month later, he viewed two photographic line-ups which had been compiled by the Plaquemines Parish Sheriffs Office. From one line-up, he positively identified Ms. Brown as the woman who sold him the two rocks of cocaine on October 3, 1996 on Good Rocking Lane in Sunrise. He could not identify anyone in a second line-up composed of men.
Agent Carroll Abadie of the Plaque-mines Parish Sheriffs Office testified he was in charge of the undercover investigation involving Agent Cannon on October 3, 1996. Abadie testified he and Agent LaV-ergne. were not within sight of the cocaine purchases from Ms. Brown, but they could hear Agent Cannon’s comments during the transactions. Abadie testified he and LaVergne met with Cannon within minutes of the second transaction, and Cannon gave him two rock-like substances which field-tested positive for cocaine. Abadie testified he placed the rocks in vials to keep them from becoming crushed and then placed the vials in an evidence envelope, which he kept in a locked drawer until giving it to the evidence custodian. Aba-die testified that after putting the evidence *96 in the drawer, he and Agent- LaVergne returned to Good Rocking Lane just to see who was in the vicinity, and when they arrived LaVergne saw a woman he identified as the defendant, who matched the description given by Cannon as the person who sold 14him the rocks of cocaine. They also saw- a man leaving the area. Based upon these sightings, LaVergne compiled two photographic line-ups, one of which included Ms. Brown’s photograph. Abadie testified he showed the line-ups to Cannon approximately a month after the sales, and Cannon positively identified Ms. Brown as the seller. Cannon was unable to identify anyone in the other line-up.
Agent Abadie testified that most surveillance cameras are installed in undercover cars at an angle to videotape activity near the driver’s door. Abadie testified that for this reason, many drug sellers will only conduct transactions from the passenger side of the vehicle. Abadie admitted he could not identify the woman on Good Rocking Lane who LaVergne identified as Ms. Brown. Abadie testified that he did not obtain an arrest warrant for Ms. Brown until February, 1997, because it was standard practice in undercover work to wait a period of time before arresting a suspect in order to protect the identity of the undercover officer.
Agent Shelby LaVergne testified he was with Agent Abadie while Agent Cannon was conducting the undercover cocaine purchases. LaVergne testified that after Abadie had taken care of the rocks of cocaine he received from Cannon, LaV-ergne and Abadie drove to Good Rocking Lane to see who was present. LaVergne testified he saw Ms. Brown sitting on the steps of a trailer, and she matched the description given by Cannon. LaVergne testified he was acquainted with Ms. Brown. LaVergne also saw a man walking away from the scene, but LaVergne did not get a good-look at the man’s face. He compiled two photographic line-ups, one of which included Ms. Brown’s photograph. LaVergne testified that the other line-up contained the photograph of the man who he thought he saw leaving the scene, but Cannon was unable to make an identification from that line-up. LaVergne testified the photograph he used of Ms.-Brown had a height | Bchart in the background, but this was the only photograph he had of her. He admitted the other photographs in the line-up did not have a chart, but he testified that he chose the other photographs to match Ms. Brown’s physical characteristics. He also testified that the other photographs of suspects which contained the height chart were of people who were not similar to Ms. Brown, thus he did not use them.
Charles Krone of the Jefferson Parish Sheriffs Office, who tested the two rocks, testified his tests concluded that the two rocks were cocaine.
Martrice Brown denied selling drugs to Agent Cannon on October 3, 1996. She testified she was against drug selling. However, she admitted she had prior convictions for simple battery and for an offense involving marijuana. She denied being on Good Rocking Lane on that date, but she admitted her residence was within walking distance of Good Rocking Lane. She denied having red hair or a red hairpiece, but she admitted she had various other colored hairpieces which she wore at various times. She testified that at the time of the offense she was not working but was doing volunteer work at the Tulane Medical Center. She explained she supported herself from money she received from men in a bar.
ERRORS PATENT REVIEW:
A review of the record reveals there are no errors patent.

ASSIGNMENT OF ERROR:

In her sole assignment of error, the appellant contends the trial court erred by denying her motion to suppress the identification. She argues her photograph was so dissimilar to the others in the line-up as to call attention to her photograph. She also contends that this suggestive identifi *97 cation procedure tainted the |fisubsequent in-court identification of her by Agent Cannon.
When reviewing an out-of-court identification procedure for its constitutionality and its consequent admissibility, the court must first make a determination of whether the police used an impermissi-bly suggestive procedure in obtaining the out-of-court identification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Hankton, 96-1538 (La.App. 4 Cir. 9/16/98), 719 So.2d 546, writ denied, 98-2624 (La.1/29/99), 736 So.2d 828; State v. Sterling, 96-1390 (La.App. 4 Cir. 11/13/96), 684 So.2d 74. If the court finds the identification suggestive, it must then decide, under the totality of the circumstances, if the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. Manson, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140; Prudholm; Hankton; Sterling.
In Manson, the Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Hankton; Sterling. As noted by this court in Sterling: “The defendant bears the burden of proving that an out-of-court identification itself is suggestive, and that there was a likelihood of misidentification as a result of the identification procedure. [citations omitted] An identification procedure is unduly suggestive if it focuses attention on the defendant.” 684 So.2d at 75.
Here, the appellant contends the identification procedure was suggestive because her photograph is the only one which features a height chart on the wall behind her. She argues that this chart drew Agent Cannon’s attention to her 17photograph, thereby causing him to choose her as the person who sold the drugs. In support of her argument that the inclusion of the height chart tainted the line-up, she cites State v. Rosette, 94-1075 (La.App. 3 Cir. 3/22/95), 653 So.2d 80, where the court found a photographic lineup was suggestive. However, Rosette is easily distinguishable. The defendant in that case was charged with conducting a drug sale to an undercover officer approximately one month prior to the officer’s viewing of the photographic line-up. The line-up consisted of four photos, and in two of them the subjects were standing next to a height chart which showed they were approximately 6’5” tall. The officer had described the perpetrator as being 5’6” tall. The remaining photographs were of the defendant and another man, and the other man was in his mid-thirties. The witness had described the perpetrator as being in his late teens. On review, the appellate court found the line-up was suggestive. It then applied the Manson factors and found the identification was unreliable, given the facts that the officer had observed the perpetrator for only a few minutes and from the other side of a car approximately a month before viewing the line-up. In addition, the description given by the officer in her report did not match that of the defendant except as to race and gender.
Here, by contrast, there was no indication that the suspect’s height was contained in the description Agent Cannon gave to the other officers on the night of the offenses. In addition, when asked if he chose the appellant’s picture because it contained the height chart, Agent Cannon replied:
A. No, I didn’t. I didn’t even realize it, until he [defense counsel] said something was different about that one particular picture.
Q. Do you see in your work photo spreads, from time to time, that have *98 various people in them that have mug shots or height charts?
|sA. Yeah. Basically from experience, when I have done photo line-ups, you pick pictures that the characteristics of the people in the pictures are as close as possible. You’re not really looking at the background or where the picture was taken, because sometimes pictures . could be taken in the street or in the office or wherever. You try to pick pictures where the people in the pictures have similar facial characteristics and stuff like that.
Agent Cannon’s comments are similar to those of the victims in State v. Williams, 97-2382 (La.App. 4 Cir. 4/21/99), 738 So.2d 598, where this court considered a claim that a photographic line-up was suggestive. The line-up contained six black-and-white photographs, but the defendant’s photograph was noticeably lighter than the others. However, this “apparent over-exposure” was the only difference between the defendant’s picture and the others, which were of men who were similar to the defendant. Both victims denied choosing the defendant’s picture because it was lighter; rather, they both insisted they chose his picture because they remembered his face. In addition, the officer who compiled the line-up testified the defendant’s photograph was his from his driver’s license, and because it had a different background, he converted all the photographs to black and white to make the defendant’s picture less noticeable: This court found that under the circumstances, the line-up was not unduly suggestive.
Also, in State v. Dickerson, 98-0029 (La.App. 4 Cir. 3/25/98), 708 So.2d 1288, six photographs were used in a line-up displayed to the crime victim. Five of the photographs had dark backgrounds; the defendant’s picture had a light background. The trial court found the line-up unduly suggestive. However, this court reversed and found that the line-up was not suggestive and the difference in the backgrounds was a result of attempting to find similar subjects to comprise the lineup. Moreover, even if the line-up was suggestive, the identification was | ^reliable and admissible. A similar conclusion was reached in State v. Every, 96-185 (La.App. 5 Cir. 7/30/96), 678 So.2d 952. There, a six-photo line-up was presented to the victim; in his picture, the defendant was not wearing a shirt, however, the other five pictures were of men wearing shirts. The court stated, “Although the defendant was the only person not wearing a shirt in each line-up, there is nothing in the record which indicated that the victim focused on that feature rather than the overall physical appearance of the defendant.” Id. at 957. Moreover, even though the court found the, line-up not suggestive, it applied the Manson factors. It found the identification reliable given the amount of time the victim had to view the defendant, her certainty in the identification, and the nominal time period between the crime and the identification.
Here, a review of the photographic lineup itself would not lead one to believe the line-up was unduly suggestive. It is true that the appellant’s photograph contains a height chart which the other photographs do not contain. However, the facial features and complexions of the other women are similar to those of the appellant. In addition, Agent Abadie testified that the only photograph he had of the appellant contained the height chart, and the only other photographs he had of other people standing in front of the height chart were of people whose descriptions did not match that of the appellant. Given Agent Cannon’s testimony concerning his unawareness of the height chart, the apparent lack of any reference to height in the description he gave to Agents Abadie and LaV-ergne, and the similarities of the other women in the line-up to the appellant, it does not appear the line-up was unduly suggestive. Therefore, the trial court did not err by denying the motion to suppress the identification.
*99 Even assuming arguendo that the line-up was suggestive, we do not find the | ¶ (Identification unreliable under the Manson factors. Agent Cannon was conducting an undercover narcotics transaction. He testified regarding his training in this field, and about this particular transaction. He stated he saw defendant clearly for seven to ten minutes and was careful to note her features because he assumed he would have to identify her again. He gave Agents Abadie and LaVergne a very detailed description of the defendant’s physical appearance and clothing immediately after the second purchase. From this description, and upon viewing the scene, Agent LaVergne was able to immediately recognize defendant. Even though he reported her hah- as red, defendant admitted that she has several different colored hair pieces. Also, upon viewing the line-up, Agent Cannon identified defendant immediately and positively. Lastly, Agent Cannon’s inability to identify anyone from the second male line-up bolsters the reliability of his selection of defendant; he did not identify anyone because he was not certain. Thus, under the totality of the circumstances, Agent Cannon’s pretrial identification of defendant was reliable and admissible.
The appellant further argues that the suggestive pretrial identification tainted Agent Cannon’s in-court identification. However, as noted above, it does not appear the pre-trial identification was suggestive. The appellant argues Agent Cannon’s opportunity to view the suspect was quite limited, again citing Rosette. However, unlike in Rosette, here Agent Cannon observed the seller not just during one short transaction but also during a second transaction. The appellant argues the viewing did not occur in daylight. However, both Agent Cannon and Agent Abadie testified that the area was lit by a streetlight. She also points to the fact that the suspect was on the other side of the car from Agent Cannon during both transactions, again citing Rosette. However, it must be noted that the officer injj¿Rosette conducted only one transaction with the defendant and conducted three others that night, while here Agent Cannon conducted both of his drug purchases that night with the same person.
The appellant next argues that the in-court identification was unreliable because Agent Cannon’s testimony concerning the description he gave to the other agents shows that the only facet of the suspect’s appearance which registered with him was her red hair, which was not present in the appellant’s photograph used in the line-up. It is true that the appellant does not have red hair in her photograph. However, it must be noted that Agents Abadi'e and LaVergne returned to the area approximately twenty minutes after the second sale, and Agent LaVergne testified he saw the appellant sitting on the steps of a trailer at that location. Agent LaVergne testified he knew the appellant, she matched the description given by Agent Cannon, and he knew she used different colored hairpieces. Indeed, the appellant admitted she wore different colored hairpieces, although she denied having a red one.
As with the appellant’s arguments with respect to the pre-trial identification, her arguments with respect to the in-court identification have no merit.
Accordingly, the appellant’s convictions and sentences are affirmed.

AFFIRMED.

. Although the minute entries and the transcript identify the appellant as ‘'Matrice’', the bill of information lists her as "Martrice”, and her signature on her bond lists her name as "Martrice.”