I .PATRICIA RIVET MURRAY, Judge.
Nathaniel Lagarde appeals his conviction and sentence for aggravated kidnapping and aggravated rape. For the reasons that follow, we affirm.
STATEMENT OF THE CASE
On January 11, 1996, the state indicted Mr. Lagarde on one count of aggravated kidnapping (La. R.S. 14:44) and one count of aggravated rape (La. R.S. 14:42). On January 17, 1996, he was arraigned and entered a plea of not guilty. On May 15, 1996, the trial court made a finding of probable cause and denied the defense’s motion to suppress the victim’s photographic identification. On November 4 and 7, 1996, this case was tried before a twelve-person jury; the jury found Mr. Lagarde guilty as charged on both counts. Post-trial, Mr. Lagarde retained new counsel and filed a motion for new trial based principally on his trial counsel’s alleged ineffective assistance. On August 3, 1999, the trial court denied the motion.[1] On December 7, 1999, the motion for new trial was reurged and again rejected. On that same date, the trial court sentenced Mr. Lagarde on each count to |alife imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. This appeal followed.[2]
*874 FACTS
On the night of August 26, 1995, D.C., the victim,[3] went to Club Whispers, a nightclub in eastern New Orleans. D.C. testified that her boyfriend, Darryl Berry, dropped her off at the club at about 10:00 or 10:30 p.m. While at the club, D.C. testified that she had one drink, but she had to wait at the bar for thirty to forty minutes to get it. She further testified that the reason she went to the club that night was to meet some of her girlfriends.
When she was unable to find her friends in the crowded nightclub, D.C. testified that she decided to go home. She further testified that her arrangement with her boyfriend was that she would call him to come get her when she was ready to go home. Although she attempted to use the pay phones inside and outside the club to call him, the phones were all in use. She then decided to walk to a nearby gas station, which was located about a block away from the club, to use the telephone. She testified that she was uncertain as to what time she left the club.
As she was walking towards the gas station a man (later identified as Mr. La-garde) drove by in a blue car and yelled “Hey, Baby.” D.C. ignored the comment and continued walking. The man then turned the car around and pulled over. When she looked back, D.C. observed the man exiting the car and carrying a small revolver. The man then grabbed her by the arm and forced her into the front passenger seat of the car. When she attempted to escape from the car, he restrained her by pulling her hair. She testified that he drove around for a lengthy period in an unfamiliar area. She stated that [she eventually stopped the car in the deserted parking lot on the side of the Bell South building in eastern New Orleans. At that location, the man raped her in the car. During the attack, he bit her on the neck. After the attack, he shoved her from the car and sped away. She then ran to a small strip shopping center and called John Everett, a close friend who she referred to as her “uncle,” to come get her. Following Mr. Everett’s instructions, she called 911 to report the rape. The 911 call was placed at 2:45 a.m.
Mr. Berry, D.C.’s boy friend, corroborated her testimony that he drove her to the nightclub at about 10:30 p.m. to meet some of her friends. He also corroborated her testimony regarding their arrangement that she would call him to pick her up when she was ready to go home. He testified that he received a call to pick her up early that morning, but it was from the hospital. When he picked her up at the hospital, he testified that “they” told him that she had been raped.
Likewise, Mr. Everett, D.C.’s close friend, corroborated her testimony that she called him early that morning. He testified that she told him that she had just been raped and asked him to come get her. He testified that he could not go get her because his car was broken. He described her as being extremely upset, crying, and so distraught that he was unable to determine her location. Mr. Everett stated that he instructed D.C. to call the police and to call him back. He further stated that he stayed on the telephone talking to her until the police arrived.
Officer Tommy Felix of the New Orleans Police Department (“NOPD”) testified that at about 2:30 a.m., on August 27, 1995, he received a report of a rape and that victim was located at Lake Forest *875 Boulevard and Bundy Road. He testified that when he arrived at the scene the victim was |4still on the phone talking to the dispatcher. Describing the victim, he stated that she was crying, her clothes were torn, and she appeared to be in shock. He further testified that the victim told him she had been raped and that she did not know her attacker. He stated that he then transported the victim to the police station, and he turned the matter over to the rape investigation unit.
Officer Tracey Mereadel of the NOPD rape investigation unit testified that she interviewed D.C. for over an hour at the station. She characterized D.C. as crying and emotionally distraught, and she noted that D.C. clung to her purse during the entire interview. She commented that D.C.’s demeanor was that of a rape victim. D.C. supplied her with the following physical description of her unknown attacker: black male, approximately six feet, clean-shaven, two hundred ten pounds, dark complexion, a center part in his hair and one braid on each side of his head about shoulder-length, black hair, brown eyes, wearing a gold medallion, white jeans, and a white jersey with a logo. She also said that her attacker was armed with a silver gun and drove a blue Nissan vehicle. Officer Mereadel accompanied D.C. to the scene of the attack and then transported her to the hospital for medical testing and treatment.
Officer Mereadel collected D.C.’s clothing (dress and underwear) and the completed rape kit prepared at the hospital and entered these items into the evidence book at headquarters for analysis by the NOPD crime lab. She also entered a copy of the 911 tape that she had made into the evidence book.[4]
IsOn September 11, 1995, D.C. met with the police sketch artist and formulated a composite sketch of her attacker. According to Officer Mereadel, D.C.’s description to the sketch artist added a new detail: her attacker had three slits cut in his eyebrow. Using the composite sketch, Officer Mereadel created wanted posters and distributed them to all NOPD districts.
On October 2, 1995, NOPD Officer Ronald Livingston spotted' a person who matched the face on the wanted poster at A.P. Tureaud and Galvez Streets, and he notified the rape investigation unit.
On October 12, 1995, D.C., without any hesitation, selected Mr. Lagarde’s picture out of the photographic lineup. Based upon D.C.’s identification of her attacker, Officer Mereadel prepared an arrest warrant for Mr. Lagarde.
Dr. Kamran Zaherí, who was qualified as an expert in emergency room medicine, was assigned to the Medical Center of Louisiana emergency room on November 27, 1995. On that date, he performed a sexual assault examination on D.C. He characterized D.C. as teary and “crying a bit.” She told him that she had a scratch mark on her right shoulder and that there was some “hair-pulling.” Although he found a scratch mark on her right shoulder, he testified there was no way to document if the “hair-pulling” occurred. He also found a cloudy-like discharge in her vaginal vault. He noted that the test results from the internal vaginal swabs he collected from D.C. indicated that there were some spermatozoa present, which evidences there was sexual intercourse.
Officer Ned Gonzales of the NOPD rape investigation section obtained samples of Mr. Lagarde’s blood and saliva, which he turned over to the crime lab for analysis *876 and comparison with stains found on the victim’s |ficlothing. On cross-examination, he testified that although the report regarding his confiscation of Mr. Lagarde’s blood refers to “blood in tube for D.N.A. analysis,” that was standard language.
Theresa Lamb, a NOPD criminalist, was qualified as an expert in the analysis of blood and seminal fluids. She examined D.C.’s dress and underwear and found seminal fluid stain only on the underwear. She tested that stain and found sperm present, which verified it was seminal fluid, but she found no identifiable blood group present in the tested substance. The latter finding indicated that the attacker was a non-secreter. She explained that about eighty percent of the population are secreters, which means they secrete their blood group substance in their own body fluids, ie., saliva, seminal fluids. The other twenty percent of the population are non-secreters, which means there is no evidence of their blood group in their body fluids.
Ms. Lamb also received and tested Mr. Lagarde’s blood and saliva samples. She determined that his blood type was group 0 and that he was a non-secreter. She explained that a comparison of the results of the two tests — the tests on Mr. La-garde’s blood and saliva samples and the seminal sample from D.C.’s underwear— were consistent. She further explained that this test was exclusionary, which she explained means “there was nothing to exclude Mr. Lagarde from the group of potential perpetrator[s].”
Officer Patricia Daniels of the corner’s office was qualified as a medical technologist. She testified that she performs forensic serology tests of rape kits. She tested the samples from D.C.’s rape kit and found seminal fluid and spermatozoa. She also determined that D.C.’s blood type was group B and that she was a secreter.
The defense called three witnesses: Ms. Hilda Tyler, Mr. Lagarde’s mother; Ms. Greta Espradron, his girl friend; and Alvin Butler, Mr. LLagarde’s neighbor at the time of the alleged crime. All three witnesses testified that Mr. Lagarde has always worn a mustache, never had slits cut in his eyebrow, has tear drop tattoos under his left eye and the word “Jesus” tattooed on his neck; and neither owned nor drove a blue car. Ms. Tyler also gave an estimate of her son’s height and weight that varied from that given by D.C.
In its rebuttal case, the state called one witness, Arthur Arnolie, an investigator with the district attorney’s office. Mr. Arnolie testified regarding certain mug shot photographs of Mr. Lagarde. He also testified regarding various information listed on Mr. Lagarde’s arrest register including his address, height, and weight.
SUFFICIENCY OF THE EVIDENCE
In three of Mr. Lagarde’s assignments of error, he attacks the sufficiency of the evidence to support his conviction. First, he argues that the lack of any physical evidence linking him to the rape or to the crime scene coupled with the inconsistencies in D.C.’s accounts of the crime, especially the large time gap between the alleged attack and her 911 call, support a theory of his innocence of both crimes. Second, he argues that the state did not prove an essential element of aggravated rape: sexual penetration. Third, he argues the state did not prove an essential element of aggravated kidnapping: that something be demanded to secure release. The lack of those elements of the respective offenses, he argues, requires reversal of his conviction.
We recently summarized the standards for reviewing sufficiency of the evidence *877 claims in State v. Young, 2002-1280, p. 10, n. 7 (La.App. 4 Cir. 1/22/03), 839 So.2d 186, 194, writ denied, 2003-0599 (La. 10/17/03), 855 So.2d 756, stating:
|RIt is well-settled that the standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found all of the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just evidence most favorable to the prosecution; and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact’s determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989). When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. Rather, this court when evaluating the evidence in the light most favorable to the prosecution, must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012. This is not a separate test from Jackson, but is instead an evidentiary guideline for the jury when considering circumstantial evidence, and this test facilitates appellate review of whether a rational juror could have found the defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984).

Id.

Mr. Lagarde’s first argument is that the evidence was insufficient to establish either offense. He argues there were numerous inconsistencies in D.C.’s account of the crime, citing the following four. First, and foremost, he stresses the fact there is a two to three-hour time gap between the alleged attack and the 911 call during which D.C.’s whereabouts are unknown. She and her boyfriend both testified that he dropped her off at the club at about 10:30 p.m. She testified she had only one drink, but it took about thirty or Rforty minutes to get it. She further testified that the entire attack lasted about one hour. However, she did not place the 911 call until 2:45 a.m.
Another inconsistency is that she testified at trial that the purpose of her trip to the gas station was to call her boyfriend to come get her. However, as reflected in the police report, her initial story on the night of the attack was that she was walking to the gas station to get change for the RTA bus. This also was inconsistent with her arrangement with her boyfriend that he was to come get her. Yet another inconsistency is that she testified she was unfamiliar with eastern New Orleans; however, she knew there was a gas station a block away from the nightclub. She further testified Mr. Lagarde drove around for a lengthy period in an unfamiliar area, yet the location from which she placed the 911 call was only a few blocks from the club. Finally, in her initial account of the attack to the police she appar *878 ently indicated that she was bound and gagged during the attack; this factor is checked off on the police report. However, at trial, D.C. denied this statement.
As to the apparent time gap, this could be attributed to the fact D.C., who was terrified that she might be killed, was only able to estimate the time the occurrences occurred. Indeed, she testified that she was uncertain as to what time she left the nightclub. Regardless, we find these assignments of error must be resolved by analyzing whether the state sufficiently established the elements of the two offenses — aggravated rape and aggravated kidnapping. We separately analyze each offense.
SUFFICIENCY OF EVIDENCE OF AGGRAVATED RAPE
Aggravated rape is defined in La. R.S. 14:42(A) as follows:
Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the |invictim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
Rape is defined by La. R.S. 14:41 as follows:
The act of anal or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent, and any sexual penetration, however slight, is sufficient to complete the crime.
Mr. Lagarde argues that the state failed to prove the element of sexual penetration. La. R.S. 14:41. In support of this contention, he distinguishes this case from State v. Hubbard, 97-916 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, in which the court found the victim’s statement that the defendant “had sex” with her was sufficient to satisfy this element. He stresses D.C.’s failure to make such a statement.
To resolve this issue requires we review D.C.’s trial testimony. On this point, she testified as follows:
Q: And what did he do next?
A: Then he just got over the seat and came and got between my legs.
Q: Did he put your seat down?
A: Yes.
Q: And you said he got between your legs?
A: Uh-huh.
Q: And how were you dressed?
A: I had on a dress with some thigh-high stockings and some heels.
lnQ: And so what happened after he got in the seat between you?
A: He started pulling at my stockings.
Q: And you said those were thigh-high stockings?
A: Uh-huh.
Q: And what did he do when he found out that they were thigh-highs?
A: He opened his pants and he pulled my underwear to the side.
Q: And what happened after he pulled your underwear to the side?
A: He did it to me.
Upon further questioning, D.C. clarified that “he raped me.” Finally, responding *879 to the prosecutor’s question “[w]as there penetration?,” she answered “[y]es.” Although Mr. Lagarde argues the latter question was -“grossly leading,” his trial counsel made no objection.
In Hubbard, supra, the case Mr. La-garde cites, the court rejected a similar argument, reasoning that “[i]t is well established that the testimony of the victim alone is sufficient to establish penetration” and that “the testimony of the victim alone, unsubstantiated by physical evidence, is sufficient to support a conviction of rape.” Hubbard, 97-916, p. 9¡ 708 So.2d at 1104.[5]- Likewise, we find D.C.’s testimony alone established all the elements of the offense of aggravated rape. According to her testimony, Mr. Lagarde raped her. As noted, she testified that there was penetration and that he had a revolver in his possession throughout the entire incident. As evidenced by the conviction, the jury apparently found D.C.’s testimony credible. The facts presented by the D.C. were sufficient for a rational trier l^of fact to conclude beyond a reasonable doubt that the Mr. Lagarde committed aggravated rape. This argument is without merit.
SUFFICIENCY OF EVIDENCE OF AGGRAVATED KIDNAPPING
Turning to the second offense, aggravated kidnapping is defined by La. R.S. 14:44 as follows:
[T]he doing of any of the following acts with the intent to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender’s actual or apparent control:
(1) The forcible seizing and carrying of any person from one place or another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
In State v. Arnold, 548 So.2d 920 (La. 1989), the Louisiana Supreme Court held that aggravated kidnapping has four elements:
1., The forcible seizing and; ,
2. the carrying of any person from one ' • place to another (the asportation element);
3. with the intent to force the victim, or ■ some other person, to give'up anything' of apparent present or prospective value (the extortion ele- ' ment);
4. in order to secure the release of that person.
Arnold, 548 So.2d at 923.
In this case, the first three elements are clearly satisfied. The first element was met because D.C. was forcibly seized. She was grabbed off the street, forced inside a vehicle, and threatened with a gun if she resisted. Likewise, the second element was met because Mr. La-garde drove D.C. from the initial location near the nightclub to the parking lot of the South Central Bell building. The third element is met since under the jurisprudence Lathe seizure of a victim with the intent to commit a rape constitutes .an intent to force the victim to give up something of “apparent present or prospective value.” Arnold, 548 So.2d at 923. It fol- *880 lows then that the sole issue is whether the state established the fourth element: that something be demanded to secure release.
Addressing the proof required to establish the fourth element, the Louisiana Supreme Court in Arnold, supra, stated:
The relevant factor in applying the fourth element of aggravated kidnapping is not whether the kidnapper explicitly communicated to the victim that performance of sexual acts would result in his or her release, but whether the kidnapper intended to extort sexual gratification from the victim by playing upon the victim’s hope of release. This intent is manifested not merely by the kidnapper’s words or actions, but by analyzing whether a reasonable person in the victim’s place, given the totality of the circumstances, would believe that he or she would not be safely released unless he or she complied with the kidnapper’s demands for sexual gratification.
Arnold, 548 So.2d at 924. The Supreme Court then reasoned that “any person who was forcibly seized, brought to a remote location, held at knifepoint and threatened in no uncertain terms with the use of that weapon, would comply with the abductor’s demands in hope of securing safe release.” Id.
In State v. Acevedo, 98-1474 (La.App. 4 Cir. 2/25/94), 638 So.2d 828, we declined the state’s request that we apply the reasoning in Arnold to a case in which there was no rape and the defendant’s intent was unclear. Distinguishing Arnold, we noted it involved a victim who “was brutalized and the defendant clearly intended to rape the victim;” whereas, we characterized the facts in the case before us as “far more ambiguous.” Acevedo, 633 So.2d at 832. We further noted that “on the evidence before us we can guess at Acevedo’s likely intentions but cannot find that Acevedo’s actions clearly manifested an intent to force the victim to comply l14with his sexual demands in hopes of obtaining her release.” Id. We thus reversed an aggravated kidnapping conviction because the state failed to prove the fourth element.
Mr. Lagarde argues that this case is analogous to Acevedo, surpa. We disagree. Unlike in Acevedo, the victim, D.C., was raped. Moreover, as the state argues, D.C. believed that she would only be released if she cooperated with the attacker. See State v. Overby, 30,589, pp. 6-7 (La.App. 2 Cir. 4/8/98), 714 So.2d 28, 32 (distinguishing Acevedo because the victim was raped and the defendant’s intent to force the victim to comply with his sexual demands in hopes of obtain her release was clear). Viewing the evidence in the light most favorable to the state, we find the state produced sufficient evidence to support Mr. Lagarde’s conviction for aggravated kidnapping.
SUGGESTIVE PHOTOGRAPHIC LINEUP
In his fourth assignment of error, Mr. Lagarde argues that the photographic lineup employed by Officer Mercadel was improperly suggestive and should not have been introduced. In support of this argument, he quotes Officer Mercadel’s testimony that she attempted to find as many pictures as possible with subjects having braids in their hair and similar facial features, but she admitted that “this was a tough lineup.” He further notes that on cross-examination she clarified that this was a “difficult” lineup because she had trouble finding a picture of another black male with braids. Given the crucial distinguishing feature of Mr. Lagarde was his hairstyle, he argues that the lineup was improperly suggestive because it included only one other individual having the same hairstyle as him. Stated otherwise, he asserts D.C.’s attention was unduly drawn *881 to his photograph, which caused her to choose him as the person who kidnapped |1Band raped her. It follows, he contends, that the lineup should not have been admitted at trial.
A defendant seeking to exclude a photographic identification must prove two factors: 1) that the identification was unduly suggestive and 2) that there was a substantial likelihood of irreparable mis-identification. State v. Buchanan, 463 So.2d 660, 661 (La.App. 4 Cir.1985). A photographic lineup is unduly suggestive if the photographs depict the defendant so singularly that the witness’ attention is unduly focused on him. Id. Although the photographic lineup Officer Mercadel prepared for D.C. to review was shown to the jury at trial, we were unable to review it.[6] As a result, we presume the photographic lineup was unduly suggestive, and turn to the second factor: whether there was a substantial likelihood of irreparable mis-identification .and thus a violation of Mr. Lagarde’s right to due process. See State v. Jackson, 540 So.2d 533 (La.App. 4th Cir.1989).[7]
To determine if there is a likelihood of misidentification, the jurisprudence has applied the following five-factor test enunciated in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977):(1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the | ^confrontation. State v. Jones, 2002-1171 (La.App. 4 Cir. 6/26/02), 822 So.2d 205 (citingManson, supra).
Applying those factors, D.C. had ample opportunity to view Mr. Lagarde during the attack. Indeed, she testified at trial that she spent approximately one hour with Mr. Lagarde from the time of her abduction to the completion of the rape and that during that hour she could clearly see his face as they drove around. She further testified that she had an unobstructed view of his face during the attack. D.C.’s attention was sharply focused on him as evidenced by her trial testimony that she “can’t forget [his face]. I see him when I go to sleep at night.” Despite the inconsistencies in her description of her attacker, her overall description of him was accurate. Indeed, the inconsistencies involved physical features that can be changed such as facial hair (a mustache) and slits in the eyebrows. D.C. identified Mr. Lagarde at trial and testified that she was certain that he was the man who attacked her. Officer Mercadel stated that D.C. immediately selected the defendant’s photograph from the lineup as the man who kidnapped and raped her. The length of time between the attack and the photographic identification was less than two months.
*882 For these reasons, we find the five-factor test was satisfied and Mr. Lagarde’s argument regarding the suggestive photographic lineup is unpersuasive.
PROSECUTORIAL MISCONDUCT
To determine whether a prosecutor’s statements made during trial so prejudiced the jury as to call for reversal of the conviction, we must decide whether the jury’s verdict would have been the same had the comments not been made. State v. Varnado, 97-2825, pp. 7-8 (La.App. 4 Cir. 9/22/99), 753 So.2d 850, 856, writ denied, 99-3187 (La.4/20/00), 760 So.2d 341. 117Mr. Lagarde cites two incidents of alleged prosecutorial misconduct that occurred during the direct examination of state’s witnesses and the cross-examination of a defense witness and contends these incidents violated his right to a fair trial.
The first claim of prosecutor misconduct is based on the state’s questioning of its experts regarding the defense’s failure to request DNA testing on the evidence retrieved in this case. Mr. Lagarde argues that the questioning prejudicially highlighted his failure to request DNA testing and misled the jury by suggesting that it was the defense’s responsibility to perform DNA testing to prove his innocence. Stated otherwise, he argues that it resulted in a constitutionally impermissible shifting of the burden of proof from the state to the defense.
We find Mr. Lagarde’s argument unpersuasive when viewed in the context in which the objectionable line of questioning was propounded. Although the record on appeal shows that the prosecutor delved into the issue of DNA testing with Dr. Zaheri, Ms. Lamb, Office Gonzales, and Ms. Daniels, it did so in direct response to defense counsel’s questions as to why DNA testing was not performed on the evidence. Hence, as the state argues, the defense opened the door to this line of questioning on cross-examination of these witnesses. The prosecutor’s questions thus were not posed in an attempt to imply that Mr. Lagarde had an obligation to prove his innocence; rather, the questions were posed to rebut the implication of the state being sloppy in failing to request such DNA testing. Additionally, the state’s expert witnesses all testified that they were not experts in DNA testing and that none of them had facilities to perform such testing. The jury also heard these experts testify that neither the state nor the defense had requested DNA testing. This assignment of error is thus without merit.
[1sThe second incident of alleged prose-cutorial misconduct occurred during the state’s cross-examination of the Mr. La-garde’s mother, Ms. Tyler, when the prosecutor posed the following question: “Do you know that two teardrops also signify that a person killed someone else?” Although defense counsel immediately objected and the court sustained the objection, Ms. Tyler responded: “I guess it was signifying for his sister, his sister and his grandmother” In her earlier direct testimony, Ms. Tyler was asked by defense counsel how long Mr. Lagarde had the two teardrops tattooed under his eye, and she answered: “[flour years. My daughter got murdered, and he put them underneath his eye, because she got murdered.”
 The prosecutor’s cross-examination was in response to Ms. Tyler’s direct testimony. Ms. Tyler clearly explained the significance of the teardrop tattoo as a sign of Mr. Lagarde’s mourning the loss of loved ones, which blunted the effect of the prosecutor’s question. Nevertheless, even assuming the prosecutor’s question was improper, it does not rise to such a level as to mandate reversal of Mr. Lagarde’s con *883 viction. Considering D.C.’s testimony that Mr. Lagarde kidnapped and raped her at gunpoint, it is unlikely that the verdict would have been different if the prosecutor had not asked the question. This assignment of error is thus without merit.
MUG SHOTS
Mr. Lagarde argues that the trial court erred in allowing the state to introduce eight mug shots of him. He asserts that the state’s sole purpose for introducing these photographs was to inflame the jury by suggesting that he was a bad person. The state counters that the need for introducing the photographs arose at trial because the defense drew attention to Mr. Lagarde’s appearance and called three witnesses in an attempt to establish a mis-identiflcation defense.
|13To address this issue of when mug shots are admissible, the jurisprudence has adopted the following tripartite test:
(1) The prosecutors must demonstrate a need to introduce the photos;
(2) The photos, if shown to the jury, must not imply that the defendant has a criminal record; and
(3) the manner of the introduction of the photos at trial must not draw particular attention to the source of the photographs.
United States v. Fosher, 568 F.2d 207 (1st Cir.1978).
Applying those factors, we first note that in this case the issue of the admissibility of these mug shots was addressed at length on the record outside of the jury’s presence immediately before the trial commenced. At that time, the trial court determined that the state would only be allowed to introduce the mug shots if a reason for admitting them presented itself during trial. Given that the defense at trial focused on misidentifieation, the state established a need to introduce the photographs as part of its rebuttal case. According to the state, it made sure any marking indicating the photographs were booking photographs were removed and that any references to prior arrests on the photos were covered. Although the photographs were introduced as part of the state’s rebuttal case through a witness whose testimony only pertained to the mug shots and Mr. Lagarde’s arrest register, the timing of the introduction of the photos was the result of the trial court’s pre-trial determination that the state could not introduce the photos unless and until the need arose at trial. We thus find this assignment of error without merit.
INEFFECTIVE ASSISTANCE OF COUNSEL
Mr. Lagarde’s seventh, and final, assignment of error is that the trial court erred in denying his motion for new trial based upon a complaint of ineffective assistance of counsel. The general rule is that “the issue ofj^ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted.” State v. Jones, 2002-2433, p. 3 (La.App. 4 Cir. 6/18/03), 850 So.2d 782, 785. An exception is recognized when the record contains sufficient evidence to rule on the merits of the claim. In the latter context, the interests of judicial economy justify consideration of the issues on appeal. Id. (citing State v. Seiss, 428 So.2d 444 (La.1983); State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Garland, 482 So.2d 133 (La.App. 4 Cir.1986); State v. Landry, 499 So.2d 1320 (La.App. 4 Cir.1986)). This case, as Mr. Lagarde contends, falls within the exception.
The issue of ineffective assistance of counsel was the subject of Mr. Lagarde’s *884 motion for new trial. On that motion, testimony was taken in the trial court at three separate hearings. At those hearings, four witnesses testified. To place this issue in context requires we review the testimony of those witnesses.
Mr. Lagarde testified that his retained trial attorney was John Thomas. He stated that, excluding court appearances, Mr. Thomas only met with him about four times. He stated he told Mr. Thomas that he knew D.C. and that on the night in question he had drinks with her at Club Whispers before they left the club together to have sex. He stated that he consistently maintained his position that it was a consensual sexual relationship between him and D.C. He also stated that he informed Mr. Thomas that he had two witnesses, Alvin Butler and Earl Atkins, who would corroborate his story.
As to the misidentification defense, Mr. Lagarde testified that Mr. Thomas told him he did not need to take the stand because they were going to win based on misidentification. He further testified his attorney’s decision to advance the misiden-tification defense precluded him from | ¡>,1 testifying and from introducing his two witnesses. He still further testified that he was disappointed about the defense because the jury came back with a guilty verdict and that he never told Mr. Thomas that there was a misidentification.
Although Mr. Lagarde was questioned extensively as to when his attorney informed him that he planned to use the misidentification defense, he failed to give a definitive answer. Instead, he maintained that he was insistent until the morning of trial that a consensual sex defense be advanced. In support, he stated that his two witnesses were present at trial and could have been called. He maintained that he and his family were very surprised when Mr. Thomas advanced the misidentification defense at trial. He admitted that his attorney told him about the misidentification defense, but claims he consistently expressed the desire to take the stand and to present his witnesses on the consensual sex defense.
On cross-examination, the state questioned Mr. Lagarde regarding the fact Mr. Thomas was a hired counsel that could have been fired. Mr. Lagarde responded that due to limited financial resources it was not feasible for him to fire his retained counsel and hire a new one.
In responding to the trial court’s questions, Mr. Lagarde testified that his attorney spoke with him about testifying at trial and that he believed he would testify. He further testified that he even had his hair braided, as he usually styles it, on the day of trial because it was not a misidentification case. He claimed he knew the victim and that it was consensual.
Mr. Thomas testified that he was Mr. Lagarde’s trial counsel.[8] He stated that Mr. Lagarde’s story was that the relationship between him andj^D.C. was one of “consensual sex.” According to Mr. La-garde, D.C. was a prostitute who became angry when he refused to pay her. Mr. Lagarde further told him that this claim was in retaliation for his refusal to pay her. Mr. Lagarde also furnished Mr. Thomas with the names of two witnesses who would corroborate his consent defense. Mr. Thomas testified that he did not believe Mr. Lagarde’s story fit with the other facts of the case. He noted that Mr. Lagarde had been involved with a large number of women, and he indicated that Mr. Lagarde may not have realized which incident was at issue.
*885 Mr. Thomas testified that he discussed with Mr. Lagarde the issue of what defense to advance at trial on numerous occasions. He stated that he informed Mr. Lagarde that the state had the burden of proving every element of the case, including identification and that if he were to testify that he had consensual sex with the victim it would relieve the state of having to prove certain elements.
At a motion hearing, Mr. Thomas testified that he questioned D.C. as to whether she had ever seen Mr. Lagarde before and whether she remembered seeing him in the neighborhood. He stated that D.C. was “really emphatic that she had never seen him before in her life, never met him at any bar, nothing like that.” Moreover, Mr. Thomas found especially convincing the 911 tape which he believed sounded authentic; particularly, he noted that on the tape D.C. “was very emotional and she was very hysterical when she called the 911.”
From the time of the motion hearing until the trial date, Mr. Thomas stated that he told the family and Mr. Lagarde that the consent defense would not work. He analogized it to an entrapment defense, which is seldom successful in this type of case. He stressed this was not a date rape _[22case. Rather, he stated that D.C. claims she was picked up on the highway at night by this man she never saw before and raped.
Shortly after the motion hearing and weeks before trial, Mr. Thomas testified that he discussed with Mr. Lagarde the issue of what defense they would advance and obtained his agreement to advance the misidentifieation defense. However, on the morning of trial, he acknowledged that Mr. Lagarde was wavering and expressing doubts about the defense and indicating that maybe he should testify. However, Mr. Thomas stated that “[e]ven at that point, had he wanted to change, I could have ... withdrawn from the case. We could have done something else. But ... I told him my advice. He agreed with me. And we went with the defense that we thought was the best.” ' Mr. Thomas thus testified that although Mr. Lagarde was nervous about the trial, he was sure that Mr. Lagarde was in agreement with the misidentifieation defense. He also testified that he “never guaranteed to a client that they would win.”
. Mr. Thomas stated that Mr. Lagarde reluctantly agreed not to testify. He stated there were other factors like prior convictions that weighed into that. However, he agreed that even without the prior convictions, Mr. Lagarde could not testify because it would be inconsistent with the mistaken identity defense. Mr. Thomas absolutely denied telling Mr. Lagarde he was going to advance the consent defense and then changing the defense during trial to misidentifieation. He further testified that he had an ethical duty not to put a witness on the stand if the witness is going to lie. He stated that he did not believe Mr. Lagarde’s story because there were numerous inconsistencies in it and because he had reasons not to believe him. Mr. Thomas testified that he came to the conclusion that “[D.C.] had been raped by someone else and that [Mr. Lagarde] had sex with someone else.” He [^stated this was his “judgment call.” He further testified that he informed Mr. Lagarde it would be bad idea for him to take the stand, but he insisted that he never instructed Mr. Lagarde not to testify. Mr. Thomas also commented that if Mr. La-garde had taken the stand and testified that D.C. was a prostitute and was only bringing these charges out of revenge for him not paying, “he would have been convicted even quicker than he was.”
*886 Mr. Thomas acknowledged that Mr. La-garde furnished him with the names of two witnesses who would corroborate his consensual sex defense. However, he stated that he interviewed these two witnesses and that he did not find them credible. He stated that these two witnesses were “two young men who stayed in the room [at the Green Tree Apartments] and that they had seen him have sex with her on the couch.” Mr. Thomas stated that he interviewed these witnesses and that he had an investigator look into whether D.C. was a prostitute or had ever been one, but he could not find anything to corroborate it. He testified that the witnesses’ descriptions were inconsistent, and he did not find them credible.
Mr. Butler, who was Mr. Lagarde’s neighbor and who testified at trial, testified that he was at the nightclub and that he saw Mr. Lagarde and D.C. He stated that Mr. Lagarde introduced D.C. to him. Mr. Butler described his encounter with D.C. as a “casual conversation in a night club.” He denied seeing her at Mr. La-garde’s cousin’s house. In response to the judge’s questions, he testified that he had never seen D.C. before that night, that he has not seen her since, and that he only saw her for a brief period of time that night at the club, yet he indicated he was sure it was the same woman. Mr. Butler also stated that he spoke with Mr. La-garde’s attorney. Although he testified at trial on the misidentification defense, Mr. Butler stated that he was neither subpoenaed for the trial nor sequestered.
_[^Earl Atkins testified that he is Mr. Lagarde’s cousin. On the date of the attack, he lived in the Green Tree Apartments, which are located about a twenty-minute walk from the Club Whispers. He testified that his cousin arrived at his door with D.C. at about 2:00 a.m. He described D.C. as an ugly old Arkansas lady. He stated that D.C. wanted to have sex with both him and his cousin for forty dollars. He testified that she and Mr. Lagarde had consensual sex at the apartment and left about a half hour later. He stated that he has seen D.C. since then “down in the neighborhood around a bad area, crack area” where the “hookers hang out.” In response to the trial judge’s question, he agreed that Mr. Lagarde came to his apartment at 2:00 a.m. to have sex with a woman. Mr. Atkins testified that he attended his cousin’s trial, but he acknowledged he was neither subpoenaed nor sequestered.
On appeal, Mr. Lagarde claims that the ineffective assistance of counsel in this case was Mr. Thomas’ decision to pursue a misidentification defense over his objection. He further claims that he was precluded from taking the stand and from calling his two witnesses. He still further claims that a substantial factor in Mr. Thomas’ decision was his mistaken belief that he had a felony record. Mr. Lagarde thus contends that this case is functionally identical to State v. Hampton, 2000-0522 (La.3/22/02), 818 So.2d 720, and that he is entitled to a new trial.
At the outset, we note that Mr. La-garde’s argument that Mr. Thomas mistakenly believed he had a criminal record is belied by the record. At the hearing at the commencement of the trial regarding the mug shots issue, Mr. Thomas expressly stated on the record that Mr. Lagarde had no prior convictions.
12r,Turning to his ineffective assistance claim, Mr. Lagarde’s argument is that his trial counsel interfered with his right to testify by insisting on pursing a misidenti-fieation defense. When, as here, a defendant’s asserts that his trial counsel interfered with his right to testify, the courts have analyzed the claim as one of ineffective assistance of counsel. United States *887 v. Mullins, 315 F.3d 449 (5th Cir.2002); United States v. Willis, 273 F.3d 592, 597 (5th Cir.2001). The well-settled standard for analyzing assistance of counsel claims is the two-part test enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under that test, the defendant must show that (1) counsel’s performance was deficient and (2) the deficiency prejudiced him. The defendant must make both showings to prove that counsel was so ineffective as to warrant reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir.1992).
The first Strickland prong requires the defendant show that his trial counsel’s performance “fell below an objective standard of reasonableness.” Mullins, 315 F.3d at 453. Although in making that determination we must give deference to counsel’s trial strategy,[9] “it cannot be reasonable trial strategy for an attorney to not honor his client’s decision to exercise his constitutional right to testify, not because the advice not to take the stand is unsound, but because counsel must in the end accede if the client will not abide by the advice.” Mullins, 315 F.3d at 454. Simply stated, “a | ¡^defendant's personal constitutional right to testify truthfully in his own behalf may not be waived by counsel as a matter of trial strategy.” Id.
As noted, Mr. Lagarde testified in response to questions by the trial court that his attorney spoke with him about testifying at trial and that he believed he would testify. However, he claims that his attorney’s decision to pursue the mistaken identification defense prevented him from testifying. On the other hand, his trial counsel, Mr. Thomas, testified that Mr. Lagarde agreed to pursue that defense and made the ultimate decision not to testify. Even assuming, arguendo, that Mr. Lagarde has demonstrated that his trial counsel performed deficiently by interfering with his right to testify, we find Mr. Lagarde is unable to establish the second Strickland prong — that counsel’s conduct prejudiced his defense.
Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Jones, 2002-2433, at p. 4, 850 So.2d at 785 (quoting Strickland, 466 U.S. at 693,104 S.Ct. 2052). Mr. Lagarde has failed to make this showing.
Mr. Lagarde’s proposed testimony was that he knew the victim, that she had consensual sex with him, and that she brought these charges in retaliation for his refusing to pay her. However, his trial attorney testified that he did not find Mr. Lagarde’s version of the events convincing and that neither would a jury. His attorney’s advice that it was a bad idea for him to testify and the soundness of that advice cuts against his claims of prejudice. In *888 advising Mr. Lagarde against testifying, his attorney testified that he l^relied on the forcefulness of the 911 tape coupled with the victim’s adamant denial at the motion hearing of knowing her attacker. Moreover, Mr. Lagarde’s proposed testimony would have been subject to vigorous cross-examination by the prosecutor, which likely would have been damaging.
For these reasons, we thus find that even if Mr. Lagarde would have testified it is not likely his testimony would have changed the outcome. Because he failed to establish the second Strickland prong, his ineffective assistance of counsel claim is without merit. We thus find no error in the trial court’s rulings denying Mr. La-garde’s motions for new trial.
ERRORS PATENT
A review for errors patent on the face of the record reveals none.
DECREE
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. The record reflects that three hearings were held on that motion at which testimony was taken; those hearings were held on July 11, 1997, November 7, 1997, and March 16, 1998. Although copies of the transcript of two of these hearings were not in the record, we granted defense counsel’s motion to supplement the record with copies of those transcriptions.

. Although the trial court granted Mr. La-garde an out of time appeal on November 3, 2000, the record was not lodged in this Court until March 2003.

. Pursuant to La. R.S. 46:1844(W), we identify the victim of a sex offense only by her initials.

. The parties stipulated at trial to the authenticity of the 911 tape of the victim's call on the night of the attack. That tape was played to the jury.

. See also State v. Hotoph, 99-243, p. 13 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045 (holding that victim's testimony alone can be sufficient to establish the elements of sex of-íense, even where the state does not introduce medical, scientific or physical evidence to prove-the commission of the offense).

. The record on appeal contains a letter from the Office of the Criminal Clerk of Court attesting that the photographic lineup is not available.

. In State v. Jackson, 540 So.2d 533 (La.App. 4th Cir.1989), a somewhat similar situation was presented. There, “[t]he pictures were either lost or otherwise unavailable for the trial court to review.” 540 So.2d at 535. The trial court presumed the pictures were suggestive and found an independent basis for the identification. On appeal, we affirmed the trial court, applying the five-prong Manson test; we reasoned: “the witnesses had a great opportunity to view the defendants. Their attention was necessarily focused on the defendants.... They identified the defendants at the motion hearing and at trial with certainty.” Id. We thus concluded that the photographic identification did not present a likelihood of irreparable misidentification and that it was properly admitted.

. For purposes of the hearing, Mr. Lagarde waived his attorney-client privilege.

. As we have recognized:
[I]f an alleged error falls "within the ambit of trial strategy” it does not "establish ineffective assistance of counsel.” State v. Bien-emy, 483 So.2d 1105 (La.App. 4 Cir.1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an. attorney's level of representation be determined by whether a particular strategy is successful.” State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363.
Jones, 2002-2433 at pp. 4-5, 850 So.2d at 785-86.